UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| G. KENNETH COULTER, JOHN SIEFKEN, GREGORY MAJOR, MICHAEL CHIEKO, ELI MOND and JOHN SUDOLSKY, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>-against-<br><br>MORGAN STANLEY & CO. INCORPORATED, MORGAN STANLEY, THE INVESTMENT COMMITTEE OF THE MORGAN STANLEY 401(k) PLAN, THE MORGAN STANLEY GLOBAL DIRECTOR OF HUMAN RESOURCES, JOHN J. MACK, KAREN JAMESLEY, WALID A. CHAMMAH, CHARLES CHASIN, JAMES P. GORMAN, ELLYN A. McCOLGAN, MICHAEL J. PETRICK, RICHARD PORTOGALLO, NEAL A. SHEAR, CORDELL G. SPENCER, MICHAEL RANKOWITZ, THOMAS C. SCHNEIDER, MICHAEL T. CUNNINGHAM, R. BRADFORD EVANS, KIRSTEN FELDMAN, EDMUND C. PUCKHABER, WILLIAM B. SMITH, CAITLIN LONG and JOHN DOE DEFENDANTS 1-10,<br><br>                Defendants. | Civ. 11-1849<br><br>**CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |

## TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ............................................................................................. 1

II. JURISDICTION AND VENUE ..................................................................... 4

III. THE PARTIES................................................................................................ 4

Plaintiffs....................................................................................................... 4

Defendants ................................................................................................... 6

    *Morgan Stanley*........................................................................................ 6

    *Morgan Stanley's Global Director of Human Resources*........................ 7

    *Morgan Stanley Board of Directors* ....................................................... 7

    *MS&Co* ...................................................................................................... 7

    *MS&Co Board of Directors*...................................................................... 8

    *The Investment Committee* ...................................................................... 8

    Additional "John Doe" Defendants ......................................................... 10

IV. DEFENDANTS' FIDUCIARY STATUS ..................................................... 11

Morgan Stanley's Fiduciary Status ........................................................... 12

Morgan Stanley's Global Director of Human Resources .......................... 13

The Morgan Stanley Director Defendant's Fiduciary Status..................... 14

MS&Co's Fiduciary Status ........................................................................ 14

The MS&Co Directors' Fiduciary Status .................................................. 15

The Investment Committee's Fiduciary Status........................................... 16

V. NATURE OF THE PLANS............................................................................ 17

401(k) Plan................................................................................................. 18

The ESOP................................................................................................... 21

Merger of the 401(k) Plan and the ESOP ................................................................ 22

VI.     CLASS ACTION ALLEGATIONS ................................................................ 22

VII.    DEFENDANTS' VIOLATIONS OF ERISA ................................................ 24

        Background of the Banking Crisis -- The Deterioration of the Subprime Market ........... 24

        The Downfall of Bear Stearns ........................................................................... 38

        Following the Collapse of Bear Stearns, Other Banks, Including
            Morgan Stanley, Were In Serious Peril ............................................... 44

        The Fall of Lehman Brothers ............................................................................ 50

        Problems Ensue After Morgan Stanley Averts Collapse ............................... 65

VIII.   DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT
        COMPANY STOCK WAS AN IMPRUDENT INVESTMENT
        FOR THE PLANS ......................................................................................... 66

IX.     CERTAIN DEFENDANTS WERE MOTIVATED BY PERSONAL
        INTERESTS WHICH WERE NOT  CONSISTENT WITH THEIR
        FIDUCIARY DUTIES ................................................................................... 68

X.      CAUSATION ................................................................................................. 69

XI.     CAUSES OF ACTION ................................................................................... 71

        Concealing a Breach ......................................................................................... 81

        Enabling a Breach ............................................................................................. 82

        Failure to Remedy ............................................................................................. 82

XII.    SECTION 404(C) DEFENSE INAPPLICABLE ........................................... 83

XIII.   REMEDY FOR BREACHES OF FIDUCIARY DUTY .................................. 84

XIV.    PRAYER FOR RELIEF ................................................................................. 85

Plaintiffs (defined herein), on behalf of themselves and all other persons similarly situated (the "Class," as defined below), allege on knowledge as to themselves and their own acts and, as to all other matters, on information and belief based upon, *inter alia*, an investigation conducted by Plaintiffs' counsel, as follows:

## I.   INTRODUCTION

1.     This is a class action brought by participants in the Morgan Stanley 401(k) Plan (the "401(k) Plan"[1]) and the Morgan Stanley Employee Stock Ownership Plan (the "ESOP") (collectively, the "Plans") against Defendants (defined herein) for violations of their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"). As a matter of substantive law, Sections 409(a) and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132(a)(2), authorize participants such as Plaintiffs to sue in a representative capacity for losses to the Plans. As a procedural matter, Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of all participants in and beneficiaries of the Plans from January 2, 2008 to December 31, 2008 (the "Class Period"). Plaintiffs seek relief on behalf of the Plans. The Plans themselves, however, are neither plaintiffs nor defendants in this action.

2.     The Plans are retirement plans operated and established by Morgan Stanley ("Morgan Stanley" or the "Company") as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Morgan Stanley is the sponsor of the ESOP, while Morgan Stanley & Co., Incorporated ("MS&Co"), a wholly-owned subsidiary of Morgan Stanley, is the sponsor of the 401(k) Plan, as the term "sponsor" is defined by Section 3(16)(B) of ERISA, 29 U.S.C. § 1002(16)(B).

---

[1] Effective August 31, 2008, the ESOP was merged into the 401(k) Plan. As used herein, "Plans" refers to the single merged Plan to the extent that the allegation concerns events subsequent to the merger.

3.      Plaintiffs were all participants in the Plans during the Class Period and each held Company Stock in their accounts during the Class Period.

4.      At all times relevant in this action, each of the Plans was heavily invested in Morgan Stanley common stock and/or units of a fund that was heavily invested in Morgan Stanley common stock (collectively, "Company Stock").  Therefore, the long-term retirement savings of the participants of the Plans were substantially dependent on the performance of Company Stock and the need for prudent fiduciary decisions by Defendants concerning this investment.  At the end of 2007, just prior to the Class Period, Company Stock comprised approximately $2.2 billion of total assets held by the Plans, while the value of that Company Stock held by the Plans fell to approximately $673 million by the end of the Class Period.

5.      Plaintiffs allege that Defendants, as "fiduciaries" of the Plans as that term is defined under Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), breached their duties to them and to the other participants in and beneficiaries of the Plans during the Class Period in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105.

6.      Specifically, Plaintiffs allege that Defendants knew or should have known, during the Class Period, that the Plans' ongoing heavy investment in Company Stock was imprudent because Morgan Stanley and its stock were exposed to extraordinary risk as a result of the financial perils of the entire banking sector.  Indeed, as of no later than September 2008, Morgan Stanley's viability as a going concern was seriously threatened.  All of this occurred against a backdrop, as previously alleged in *In re Morgan Stanley ERISA Litigation*, Master File No.: 07 11285 (S.D.N.Y.), in which Morgan Stanley was encountering enormous credit and liquidity problems as a result of, *inter alia* (i) its significant involvement in investment conduits, namely Collateralized Debt Obligations ("CDOs") and structured investment vehicles ("SIVs"); (ii) its

2

exposure to substantial counter-party risk as well as the deteriorating subprime credit market; (iii) its serious exposure to the risk of losing liquidity as its lenders withdrew funds it needed to continue operations;  (iv) its unprecedented — and only recently revealed — dependency on hundreds of billions of dollars in emergency government loans; and (v) inadequate internal controls and risk management failures.  As a consequence of these problems, which were not adequately or completely disclosed to the market or to the participants of the Plans, Company Stock was an imprudent, inappropriate and exceedingly risky investment for the retirement savings of the Plans' participants throughout the Class Period.

7.      Defendants breached their fiduciary duties of prudence and loyalty by, despite the above-described extraordinary risks, *inter alia*: (i) offering Company Stock as a 401(k) Plan investment option for participant-directed contributions to the 401(k) Plan; (ii) failing to divest any of the Plans' heavy investment in Company Stock from the Plans; (iii) choosing to fund all Matching and Profit Sharing contributions to the Plans (hereinafter, "Company Contributions") solely in the form of Company Stock; and (iv) misrepresenting and failing to communicate complete and accurate information to the Plans' participants regarding the extraordinary risks faced by Morgan Stanley during the Class Period.

8.      The actions and inactions of Defendants, as alleged herein, run directly counter to the express purpose of ERISA retirement plans, which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001.

9.      As a result of Defendants' fiduciary breaches, the Plans incurred substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plans' participants, as the trading price for the Company's common stock plummeted from over $45 per share prior to the first day of the Class Period, to as

low as $10 per share during the Class Period, and reaching only approximately $16 per share as of the end of the Class Period.

10.     Because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are based upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct sufficient discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint.

## II.   **JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

12.     This Court has personal jurisdiction over Defendants pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District.  The Court also has personal jurisdiction over Defendants because Morgan Stanley and MS&Co maintain their executive offices in this District.  Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.     Venue is proper in this District pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because the Plans were either administered in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

## III.   **THE PARTIES**

### **Plaintiffs**

14.     **Plaintiff G. Kenneth Coulter** is a resident of the State of Florida and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C.

4

§ 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Coulter held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

15.   **Plaintiff John Siefken** is a resident of the State of Washington and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Siefken held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

16.   **Plaintiff Gregory Major** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Major held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

17.   **Plaintiff Michael Chieko** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Chieko held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

18.   **Plaintiff Eli Mond** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Mond held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

19.   **Plaintiff John Sudolsky** is a resident of the State of New York and was at all relevant times a participant in the Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  During the Class Period, as a result of his or Morgan Stanley's contributions, plaintiff Sudolsky held Company Stock in his individual 401(k) Plan and/or ESOP accounts.

5

**Defendants**

20.     As alleged in Section IV below ("Defendants' Fiduciary Status"), all Defendants were fiduciaries of the Plans during all or part of the Class Period within the meaning of ERISA and breached their fiduciary duties in the various ways alleged in Section XI below ("Causes of Action").

### *Morgan Stanley*

21.     **Defendant Morgan Stanley** is a Delaware corporation headquartered in New York, New York.   Morgan Stanley is a global financial services company that, through its subsidiaries and affiliates, provides its product and services -- namely, financial advisory services, investment advisory services covering various investment alternatives, global asset management products and services in equity, fixed income, alternative investments, and private equity -- to a large and diversified group of clients and customers, including corporations, governments, financial institutions, and individuals.   *See* Securities and Exchange Commission ("SEC") Form 10-K for the fiscal year ended November 30, 2008, filed in January 2008 ("MS 2008 Form 10-K").   As of November 30, 2007, Morgan Stanley had 46,964 employees worldwide. *Id.*

22.     On September 21, 2008, Morgan Stanley obtained approval from the Board of Governors of the Federal Reserve System (the "Fed") to become a bank holding company and thereafter became a financial holding company under the Bank Holding Company Act of 1956 (the "BHC Act").

23.     Defendant Morgan Stanley is the "sponsor" of the ESOP.   *See* 2007 Summary Plan Description ("2007 SPD") at 23.

24.     At all relevant times herein, defendant Morgan Stanley acted through, *inter alia*, members of its Board of Directors, its officers and employees, members of the Investment

6

Committee (defined herein) and the Plan Administrator (defined herein). As a matter of law, Morgan Stanley is imputed with the knowledge of these individuals.

### *Morgan Stanley's Global Director of Human Resources*

25.     **Defendant Karen Jamesley** was, upon information and belief, Morgan Stanley's Global Director of Human Resources during the Class Period.

26.     Upon information and belief, Morgan Stanley's Global Director of Human Resources (or her delegate) was, during the Class Period, the "Plan Administrator" of the 401(k) Plan. *See* definition of "Plan Administrator" in 401(k) Plan. Morgan Stanley's Global Director of Human Resources (or her delegate) was, during the Class Period, also the "Plan Administrator" of the ESOP. *See* Article 1.34 of the ESOP.

### *Morgan Stanley Board of Directors*

27.     **Defendant John J. Mack** was, at all times during the Class Period, Morgan Stanley's Chief Executive Officer ("CEO") and its Chairman of the Board.

### *MS&Co*

28.     **Defendant MS&Co**, a Delaware corporation headquartered in New York, New York, is a wholly subsidiary of Morgan Stanley. MS&Co is part of Morgan Stanley's Global Wealth Management Group, providing its individual and business customers with brokerage and investment advice through products such as annuity, insurance, and credit vehicles. MS&Co is Morgan Stanley's primary broker-dealer in the U.S.

29.     Defendant MS&Co is the "sponsor" of the 401(k) Plan. *See* 2007 SPD at 23.

30.     At all relevant times herein, defendant MS&Co acted through, *inter alia*, members of its Board of Directors, its officers and employees, members of the Investment Committee (defined herein) and the Plan Administrator (defined herein). As a matter of law, MS&Co is imputed with the knowledge of these individuals.

### *MS&Co Board of Directors*

31.     Upon information and belief, the following individuals served as members of the Board of Directors of MS&Co (hereinafter, the "MS&Co Director Defendants") during the Class Period:

(a)     Defendant **Walid A. Chammah** was, during the Class Period, Managing Director of MS&Co and Head of Investment Banking of Morgan Stanley;

(b)     Defendant **Charles Chasin** was, during the Class Period, Managing Director of MS&Co and Chief of Staff to the Co-President of Morgan Stanley;

(c)     Defendant **James P. Gorman** was, during the Class Period, Managing Director of MS&Co and President and Chief Operations Officer, Global Wealth Management Group of Morgan Stanley;

(d)     Defendant **Ellyn A. McColgan** was, during the Class Period, Managing Director of MS&CO and Chief Operations Officer of Global Wealth Management Group; and

(e)     Defendant **Michael J. Petrick** was, during the Class Period, Managing Director of MS&Co and President of Morgan Stanley Strategic Investments, Inc.

(f)     Defendant **Richard Portogallo** was, during the Class Period, Managing Director of MS&Co.

(g)     Defendant **Neal A. Shear** was, during the Class Period, Managing Director of MS&Co. and Global Head of Fixed Income.

(h)     Defendant **Cordell G. Spencer** was, during the Class Period, Managing Director of MS&Co. and Global Co-Head of Investment Banking.

### *The Investment Committee*

32.     At all times during the Class Period, management of the Plans was in the hands of the Investment Committee, members of which, as alleged herein, were appointed by and served

8

at the pleasure of the Board of Directors of MS&Co.   Under the terms of the Plans, the Investment Committee consisted of no fewer than three persons, each of whom was an employee or advisory director of Morgan Stanley or MS&Co.   The Investment Committee was delegated responsibility for the selection of investment options for the Plans and for monitoring the performance of those investment options. *See* Section 8(f)(i) of the 401(k) Plan.

33.   Upon information and belief, the following individuals (hereinafter, the "Investment Committee Defendants") served as members of the Investment Committee during all or part of the Class Period:

(a)   **Defendant Michael Rankowitz** was a member of the Investment Committee during the Class Period.   Upon information and belief, defendant Rankowitz was employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(b)   **Defendant Thomas C. Schneider** was a member of the Investment Committee during the Class Period.   Upon information and belief, defendant Schneider has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(c)   **Defendant Michael T. Cunningham** was a member of the Investment Committee during the Class Period.   Upon information and belief, defendant Schneider has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(d)   **Defendant R. Bradford Evans** was a member of the Investment Committee during the Class Period.   Upon information and belief, defendant Evans has been

employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(e)     **Defendant Kirsten Feldman** was a member of the Investment Committee during the Class Period.  Upon information and belief, defendant Feldman has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period;

(f)     **Defendant Edmund C. Puckhaber** was a member of the Investment Committee during the Class Period.  Upon information and belief, defendant Puckhaber has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period; and

(g)     **Defendant William B. Smith** was a member of the Investment Committee during the Class Period.  Upon information and belief, defendant Smith has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period.

(h)     **Defendant Caitlin Long** was a member of the Investment Committee during the Class Period.  Upon information and belief, defendant Long has been employed by Morgan Stanley or one of its subsidiaries or affiliates during all or part of the Class Period.

**Additional "John Doe" Defendants**

34.     Without limitation, unknown "John Doe" Defendants 1-10 are other individuals, including members of the Investment Committee and officers, directors and employees of Morgan Stanley and MS&Co, who have been fiduciaries of the Plans during the Class Period within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  The identities of the John Doe Defendants are currently unknown to Plaintiffs.  Once their identities are ascertained, Plaintiffs may seek leave to join them to the instant action under their true names.

## IV.   **DEFENDANTS' FIDUCIARY STATUS**

35.   ***Named Fiduciaries***.   ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the Plan."   ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).   The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the Sponsor of the plan is the administrator and thereby the named fiduciary.   ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

36.   Instead of delegating fiduciary responsibility for the Plans to external service providers, Morgan Stanley and MS&Co chose to comply with the requirement of Section 402(a)(1) of ERISA by assigning their own officers, employees and agents to perform relevant fiduciary functions.   Although the Plans had an institutional trustee unrelated to Morgan Stanley, the Trust Agreement governing the Plans required the Trustee (defined below) to take directions from Morgan Stanley.

37.   ***De Facto Fiduciaries***.   ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who *in fact* perform fiduciary functions (including juridical persons such as Morgan Stanley and MS&Co).   A person is a fiduciary to the extent that he or she: (i) exercises any discretionary authority or discretionary control with respect to management of a retirement plan or exercises any authority or control with respect to management or disposition of its assets; (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of a retirement plan, or has any authority or responsibility to do so; or (iii) has any discretionary authority or discretionary responsibility in the administration of a retirement plans.   ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

38.     Each Defendant was a *de facto* fiduciary with respect to the 401(k) Plan and/or the ESOP and owed fiduciary duties to the Plans and their participants under ERISA in the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

39.     The following allegations with respect to Defendants' fiduciary status during the Class Period are based upon Morgan Stanley's Form 11-K for the 401(k) Plan filed for the fiscal year ending December 31, 2008, Morgan Stanley's Form 10-K for the fiscal year ended November 30, 2008, and documents provided by Defendants in February 2008 in response to a request made pursuant to ERISA Section 104(b)(4), including: the Master Plan documents for the 401(k) Plan and ESOP; the Master Trust Agreements for the 401(k) Plan and ESOP; annual reports (IRS/DOL Form 5500s); Summary Plan Descriptions; and a list of Investment Committee members.

### Morgan Stanley's Fiduciary Status

40.     Under the terms of the 401(k) Plan, the Plan Administrator was a "Named Fiduciary" of the 401(k) Plan. *See* Sections 14(a) of the 401(k) Plan. Under the terms of the 401(k) Plan, Morgan Stanley's Global Director of Human Resources was the Plan Administrator of the 401(k) Plan. *See* definition of Plan Administrator in the 401(k) Plan.

41.     Under the terms of the ESOP, the Plan Administrator was a "Named Fiduciary" of the ESOP. *See* Article 9.01 of the ESOP. Under the terms of the ESOP, Morgan Stanley's Global Director of Human Resources was the Plan Administrator of the ESOP. *See* Article 1.34 of the ESOP.

42.     Because Morgan Stanley's Global Director of Human Resources, the Plan Administrator, acted at all relevant times as an agent and on behalf of Morgan Stanley, Morgan Stanley was a "Named Fiduciary" of both the 401(k) Plan and the ESOP.

43.     In addition, based on its duties, responsibilities and actions, Morgan Stanley was a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. §1002(21). Upon information and belief, Morgan Stanley exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets or exercised discretionary authority or discretionary responsibility in the administration of the Plans in at least the following ways:

(a)     Morgan Stanley, through its Global Director of Human Resources, was responsible for administering and managing the Plans on a day-to-day basis;

(b)     Morgan Stanley was responsible for preparing and distributing communications to participants regarding the Plans, including (i) Summary Plan Descriptions of the Plans ("SPDs") (which were issued in Morgan Stanley's name); (ii) Form S-8 registration statements; and (iii) SEC filings incorporated by reference into the SPDs;

(c)     Morgan Stanley had the power and authority to fund Company Contributions to the Plans, and the full power and authority to determine whether to cause such funding to be made in form of Morgan Stanley common stock or in cash. *See* Articles 3.01(a) and 3.06(a) of the ESOP. On information and belief, at all times during the Class Period, Morgan Stanley, through its Board of Directors, determined to fund all Company Contributions to the Plans *solely* with Company Stock; and

(d)     Morgan Stanley had the power and authority to establish rules regarding the transfer of Company Stock into other forms of investment in the Plans, and exercised such authority throughout the Class Period to limit such transfers.

### Morgan Stanley's Global Director of Human Resources

44.     During the Class Period, defendant Jamesley occupied the position of Global Director of Human Resources for Morgan Stanley, which was the Plan Administrator of both the 401(k) Plan and the ESOP. Defendant Jamesley is therefore herself a fiduciary of the Plans, since, as alleged above (i) the Plan Administrator was the "Named Fiduciary" of the Plans during the Class Period; and (ii) the Plan Administrator was a *de facto* fiduciary of the Plans within the

13

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that the Plan Administrator exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets or had discretionary authority or discretionary responsibility in the administration of the Plans.

### The Morgan Stanley Director Defendant's Fiduciary Status

45.    Based on his duties, responsibilities and actions, defendant Mack was a *de facto* fiduciary of the Plans during the Class Period, within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that he exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets or had discretionary authority or discretionary responsibility in the administration of the Plans, in at least the following ways:

(a)    on information and belief, defendant Mack determined or participated in determining the substantive content of Morgan Stanley's SEC filings, which, on information and belief, were incorporated by reference into the SPDs and Form S-8 registration statements;

(b)    on information and belief, during the Class Period defendant Mack and the other members of Morgan Stanley's Board of Directors authorized the contribution of either shares of Company Stock (either newly issued or treasury shares) or cash in an amount necessary to satisfy Morgan Stanley's obligations to make Company Contributions to the ESOP, and with the other members of Morgan Stanley's Board of Directors appointed himself as the sole member of a committee of the Board of Directors with the power and authority to determine whether to satisfy such obligations with cash, Company Stock, or a combination thereof; and

(c)    on information and belief, during the Class Period defendant Mack directed that all Company Contributions be made in Company Stock.

### MS&Co's Fiduciary Status

46.    Based on its duties, responsibilities and actions, MS&Co was a *de facto* fiduciary of the Plans during the Class Period, within the meaning of ERISA §3(21), 29 U.S.C.

§ 1002(21), in that it exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets or had discretionary authority or discretionary responsibility in the administration of the Plans, in at least the following ways:

   (a) throughout the Class Period, MS&Co had the authority and discretion, through its Board of Directors, to appoint, monitor and remove members of the Investment Committee. *See* Section 8(f)(i) of the 401(k) Plan;

   (b) at all times during the Class Period, defendant MS&Co had the authority to control and manage the operation and administration of the 401(k) Plan, to make rules and regulations with respect to the 401(k) Plan, and to take actions to administer the 401(k) Plan. *See* SEC 2008 Form 11-K; and

   (c) Section 6(f) of the 401(k) Plan states that Company Contributions "shall be made in the form of cash, unless the Company [defined as MS&Co] determines that any and all such contributions shall be made in the form of Company stock [defined as the common stock of Morgan Stanley]." Thus, MS&Co had the authority and discretion to determine whether to allow Company Contributions to the Plans to be made in the form of Morgan Stanley common stock or in cash. On information and belief, during the Class Period MS&Co approved the funding of Company Contributions to the ESOP in either cash or Company Stock.

### The MS&Co Directors' Fiduciary Status

47. Based on their duties, responsibilities and actions, the MS&Co Director Defendants were *de facto* fiduciaries of the Plans during the Class Period, within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control with respect to management or disposition of the Plans' assets and/or had discretionary authority or discretionary responsibility in the administration of the Plans, in at least the following ways:

   (a) during the Class Period, the MS&Co Director Defendants had ultimate oversight over the Plans, with the power and responsibility to appoint, monitor and replace members of the Investment Committee. *See* Section 8(f)(i) of the 401(k) Plan;

(b)     on information and belief, during the Class Period the MS&Co Director Defendants monitored the performance of the Investment Committee, adopted guidelines for the Investment Committee, provided approvals regarding the determinations of the Investment Committee and reviewed reports prepared by the Investment Committee; and

(c)     on information and belief, during the Class Period the Executive Committee of the MS&Co Board Directors directed and permitted Company Contributions to the Plans be paid to the Trustee of the Plans in either cash or Company Stock.

**The Investment Committee's Fiduciary Status**

48.     At all times during the Class Period, the Investment Committee was a "Named Fiduciary" of the 401(k) Plan under Section 402(a)(2) of ERISA,  29 U.S.C. § 1102(a)(2).  *See* Section 8(f)(i)(1) of the 401(k) Plan.  Upon information and belief, the Investment Committee took on the status of the Named Fiduciary of the combined 401(k) Plan and ESOP when the ESOP was merged into the 401(k) on August 31, 2008.

49.     In addition, based on their duties, responsibilities and actions, the members of the Investment Committee were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control with respect to management of the Plans, exercised authority or control with respect to management or disposition of the Plans' assets and/or had discretionary authority or discretionary responsibility in the administration of the Plans, in at least the following ways:

(a)     the Investment Committee was charged with the authority to select and monitor the investment alternatives for the Plans.  *See* Section 8(b)(i) of the 401(k) Plan; and

(b)     upon information and belief, during the Class Period the Investment Committee exercised its discretion and authority by, *inter alia*, (i) evaluating and retaining investment consultants to the Plans; (ii) determining investment strategies for the Plans; (iii) determining investment options for the Plans' participants; and (iv) eliminating investment options of the Plans.

16

## V.   **NATURE OF THE PLANS**

50.     The assets of an employee benefit plan must be "held in trust by one or more trustees." ERISA §403(a), 29 U.S.C. § 1103(a).

51.     Prior to August 31, 2008, the assets of the 401(k) Plan and the ESOP were combined and commingled in the Morgan Stanley Defined Contribution Master Trust ("Master Trust") and held in trust by Mellon Bank, N.A. ("Mellon" or "Trustee"), pursuant to a Trust Agreement dated February 20, 2001 (the "Trust Agreement") entered into between Mellon and Morgan Stanley. Use of the Master Trust permitted the commingling of assets of the 401(k) Plan and the ESOP for investment and administrative purposes. The Trustee maintained supporting records for the purpose of allocating the net gain or loss of the investment account to each Plan and the investment income of the investment assets was allocated by the Trustee to each Plan based on the performance of each investment attributable to each Plan. *See* 2007 and 2008 Forms 11-K.

52.     Effective August 31, 2008, all ESOP assets were merged into the 401(k) Plan, resulting in one-tax-qualified defined contribution plan held in the trust account. On October 20, 2008, pursuant to the merger, all assets were transferred to the 401(k) Plan account under the Defined Contribution Trust (the "Trust"). Mellon remained the Trustee. *See* 2007 and 2008 Forms 11-K.

53.     An employee benefit plan must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. 1102(a)(1). During the Class Period, the Plans were maintained under the following instruments:

- The 401(k) Plan, amended and restated as of October 1, 2002 (the "401(k) Plan"); and

- The ESOP, amended and restated as of January 1, 2002.

17

54.     During the Class Period, each of the Plans was an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).  The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  Upon information and belief, the Plan Administrator of the Plans or Plan provided a Summary Plan Description ("SPD") to every participant of the Plans, or Plan, as required by ERISA.

55.     ERISA and the Internal Revenue Code require that Plan Administrators file a Form 5500 with the Department of Labor and the Department of the Treasury.   Upon information and belief, Form 5500s were filed by the Plan Administrator for the Plans or Plan.

56.     As of the end of 2008, after the merger of the 401(k) with the ESOP, the combined Plan investment in the Trust account with respect to Company Stock was $673,555,633.  *See* 2008 Form 11-K.  As of the end of 2007, the total combined value of Company Stock in Plans was approximately $2.2 billion.  *Id.*

**401(k) Plan**

57.     The 401(k) Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  Full-time and Part-time employees who work at least 20 hours per week are eligible to participate in the 401(k) Plan at the commencement of employment.  *See* 2008 Form 11-K.  Part-time employees not regularly scheduled to work 20 or more hours per week may become participants in the 401(k) Plan as of the first date following either: (i) the date on or between January 1, 2004 and August 15, 2005 on which they had completed one year of service, or (ii) the date on or after August 15, 2005, on which they had completed one year of service and reached 21 years of age.

58.     According to Morgan Stanley's 2007 SPD, the "Morgan Stanley 401(k) Plan and the Morgan Stanley Employee Stock Ownership Plan (ESOP) provide [employees] an

opportunity to save for retirement on a tax favored basis and supplement [their] savings with Company contributions." *See* 2007 SPD.

59.     Individual accounts are maintained for each 401(k) Plan participant.   Each participant's account is credited with employee contributions, Company contributions and the 401(k) Plan's earnings, and charged with the allocation of investment losses and administrative expenses not otherwise paid by Morgan Stanley. *Id.*

60.     All contributions to the 401(k) Plan are allocated among the available investments as selected by the participant from among the investments designated by the Investment Committee.  As of December 31, 2008, there were 35 investment vehicles within the Master Trust, including a fund consisting of Company Stock, available for selection in the 401(k) Plan. *Id.*

61.     Plan participants with an annual salary of less than $200,000 per year are eligible for the Company's matching program.  The Company matches dollar for dollar value up to six percent of an employee's pre-tax eligible pay (which was limited to $170,000 in pay in 2007) for the first $2,000 of eligible pre-tax contributions, and 50 cents per dollar for each additional dollar of eligible pre-tax contributions.  The maximum amount of the Company match in 2007 was $6,100. *Id.*

62.     In addition, the Company may make discretionary profit sharing contributions, the amounts of which vary from year to year and are determined by individual business units.  These distributions are measured as a percentage of eligible pay where eligible pay is limited to $100,000 per year.  In 2006, the profit sharing distribution was 2% of Eligible Pay (see 2006 11-K), and in 2007 no profit sharing distribution was made. *Id.*

63.     The Company also makes certain other contributions, including for employees hired after June 30, 2007, a "retirement contribution" for employees who have worked at the Company for at least one year.  Retirement Contributions are from 2% to 5% of an employee's income per year, depending on the length of time he or she has been with the Company.  In 2007, the Retirement Contribution to the Plan was $127,101. *Id.*

64.     Prior to November 1, 2007, each participant could elect to make contributions to the 401(k) Plan on a pre-tax basis through payroll deductions from 1% through 20% of such participant's eligible annual compensation up to an annual maximum of $15,000 for 2006.  In addition, participants who are age 50 or older could elect to make a pre-tax catch-up contribution to the 401(k) Plan through payroll deductions from 1% to 20% of eligible compensation to an annual maximum of $5,000 in 2006.  Effective November 30, 2007, the Plan increased the pre-tax contribution limit to 30% of eligible pay.  For 2007, the maximum amount was $15,500.  Participants aged 50 and older could elect a pre-tax "Catch-Up Contribution" of 1% to 30% of eligible pay, that was, again, subject to Tax Code limits of $5,000.  A participant can elect to change the rate at which his/her contribution is determined at any time during the year. *See* 2008 Form 11-K.

65.     In 2006, employees – other than those considered to be non-highly compensated employees – could also elect to contribute up to 10% of eligible compensation in after-tax dollars up to an annual maximum of $10,000.  In 2007, the amount rose to 30% of eligible compensation, subject to an annual maximum determined by the Tax Code. *See* 2006, 2007 and 2008 Forms 10-K.  This amount remained the same in 2008.

66.     Participants are always 100% vested in contributions to the 401(k) Plan made from their eligible compensation and in the earnings thereon. *Id.*

### The ESOP

67.     All full and part time employees regularly scheduled to work at least twenty hours per week are eligible to participate in the ESOP.  Part time employees regularly scheduled to work less than 20 hours per week are not permitted to make employee contributions to the ESOP.

68.     Upon information and belief, during the Class Period participants made contributions to the ESOP through their contributions to the 401(k) Plan, with all investments in Company Stock then transferred to the ESOP.  Prior to August 31, 2008, quarterly transfers were made from the Company Stock Fund in the 401(k) Plan Fund in the ESOP.  *See* 2008 Form 11-K.

69.     Upon information and belief, under the terms of the 401(k) Plan there was no requirement that any of the 401(k) Plan be invested in Company Stock.  The requirement was simply that if a portion of the 401(k) Plan were invested in Company Stock, such portion would be transferred to the ESOP.  Thus, the 401(k) Plan is not "designed" to invest primarily in qualifying employer securities.

70.     Participants in the Plans hired on or after January 1, 2004 become vested in Company Contributions and earnings thereon in the ESOP upon the earlier of the following: (1) completion of three years of service; or (2) termination of employment due to death, total and permanent disability, retirement, or release as defined in the 401(k) Plan.  *See* 2008 Form 11-K.

71.     Under Section 6(f) of the 401(k) Plan, "Company Contributions [which includes the Matching Contributions] to the Plan for a Plan Year shall be made in the form of cash unless the Company [MS&Co] determines that any and all such contributions shall be made in the form of Company Stock."

72.    Because the ESOP merged into the 401(k) Plan on August 31, 2008, Company Contributions for 2008 were allocated in Company Stock under the Plan in January 2009.  *See* 2008 Form 11-K.

73.    On information and belief, during the Class Period, participants in the Plans who were under 55 years old and/or who did not have 3 years of service were restricted with respect to the transfer of any Company Stock in the Plans that was attributable to Company Contributions.

74.    In 2007, the expense of the Matching and Profit Sharing Contributions was $128 million.  *See* Morgan Stanley 2007 Form 10-K and 2007 Form 11-K.  The amount of the 2008 Company matching contribution to the Plan was $105,928,585 (of which $104,209,438 was funded by treasury shares of the Company).  *See* 2008 Form 11-K.

### Merger of the 401(k) Plan and the ESOP

75.    According to Morgan Stanley's 2008 11-K, on August 31, 2008 the ESOP was merged with the 401(k) Plan.

76.    Following the merger of the Plans, the Trust holds the assets of the 401(k) Plan, including the assets of the former ESOP which are held in the Morgan Stanley Stock Fund.  *See* MS 2008 Form 11-K.

77.    The remaining features of the 401(k) Plan, as described *supra*, remain unchanged.

## VI.    CLASS ACTION ALLEGATIONS

78.    Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(l), and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All participants in or beneficiaries of the Plans at any time between January 2, 2008, and December 31, 2008 (the "Class Period"), whose accounts included investments in Morgan Stanley Company

Stock and were damaged thereby.  Excluded from the Class are the Defendants, any entity other than the Plans in which the Defendants have a controlling interest, or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of the Defendants.

79.     Plaintiffs meet the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

80.     *Numerosity*.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believes there are, at a minimum, over ten thousand members of the Class who participated in or were beneficiaries of the Plans during the Class Period and who held Company Stock in the Plans.

81.     *Commonality*.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

     (a)     Whether Defendants acted as fiduciaries;

     (b)     Whether Defendants breached their fiduciary duties to the Plans and members of the Class by failing to act prudently and solely in the interests of the Plans, and the Plans' participants and beneficiaries;

     (c)     Whether Defendants violated ERISA;

     (d)     Whether the Plans and members of the Class sustained a loss in vested benefits, and

     (e)     The proper measure of loss to the Plans and subsequent allocation of vested benefits to the Plans' participants.

82.     *Typicality*.  Plaintiffs' claims are typical of the claims of the Class members because the Plans, Plaintiffs and the Class sustained a decrease in vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

23

83.   *Adequacy.*  Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

84.   Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the Class members would create a risk of adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions or substantially impair or impede their ability to protect their interests.

85.   Class action status is also warranted under Rule 23(b)(2).  This is because: (i) prosecution of separate actions by the Class members create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plans and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Plans or Class as a whole; and (iii) as alleged herein, questions of law or fact common to Class members predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy, because, among other reasons, the claims of the individual class members are each relatively small compared to the cost of litigating and proving Defendants' wrongful conduct in this action.

## VII.   DEFENDANTS' VIOLATIONS OF ERISA

### Background of the Banking Crisis --
### The Deterioration of the Subprime Market

86.   In late 2006, senior risk officers at each of the five largest investment banks -- including Morgan Stanley -- told the SEC that they recognized the refinancing and real estate

booms were over and that they expected further subprime lender failures in 2007.[2]  As noted in

the Report of the Financial Crisis Inquiry Commission submitted to Congress in January 2011

(the "FCIC Report"):

> Senior risk officers of the five largest investment banks told the
> Securities and Exchange Commission that they expected to see
> further subprime lender failures in 2007.  "There is a broad
> recognition that, with the refinancing and real estate booms over,
> the business model of many of the smaller subprime originators is
> no longer viable," SEC analysts told [SEC] Director Erik Sirri in a
> January 4, 2007, memorandum.

FCIC Report at 233 (footnotes omitted).

87.    On January 18, 2007, Moody's issued a special report entitled "Early Defaults

Rise in Mortgage Securitizations," overseen by its chief credit officer, Nicolas Weill, in response

to reports of sharp increases in early payment defaults.  The Moody's special report focused on

an alarming increase in foreclosures concentrated in subprime mortgage pools, particularly those

that had been securitized in 2006.  As the FCIC Report notes:

> In early 2007, a Moody's special report, overseen by Weill, about
> the sharp increases in early payment defaults stated that the
> *foreclosures were concentrated in subprime mortgage pools.*  In
> addition, *more than 2.75% of the subprime mortgages securitized
> in the second quarter of 2006 were 60 days delinquent within six
> months,* more than double the rate a year earlier (1.25%).  The
> exact cause of the trouble was still unclear to the ratings agency,
> though.  "Moody's is currently assessing whether this represents an
> overall worsening of collateral credit quality or merely a shifting
> forward of eventual defaults which may not significantly impact a
> pool's overall expected loss."

FCIC Report at 221-22 (emphasis added; footnotes omitted).[3]

---

[2]  Subprime lending is the practice of making mortgage loans to persons generally unable to access credit
from traditional financial institutions because they fail to satisfy credit, documentation, or other
underwriting standards mandated by traditional mortgage lenders and loan buyers, which typically lend
only to more credit-worthy borrowers.

88.    The deterioration of the housing and mortgage markets continued in 2007:

> As 2007 went on, increasing mortgage delinquencies and defaults
> compelled the ratings agencies to downgrade first mortgage-
> backed securities, then CDOs.[4]   Alarmed investors sent prices
> plummeting. Hedge funds faced with margin calls from their repo
> lenders were forced to sell at distressed prices; many would shut
> down.  Banks wrote down the value of their holdings by tens of
> billions of dollars.

FCIC Report at 213 (footnotes omitted).

89.    Moody's continued to update the market on the weakening status of the subprime

mortgage market, and began assigning negative ratings to an increasing number of subprime

securities, leading to a startling announcement on July 10, 2007, in which it downgraded 399

subprime mortgage-backed securities, affecting $5.2 billion in securities:

> For the next few months, *the company published regular updates
> about the subprime mortgage market.*  Over the next three months,
> Moody's took negative rating actions on 4.5% of the outstanding
> subprime mortgage securities rated Baa.  Then, on July 10, 2007,
> in an unprecedented move, *Moody's downgraded 399 subprime
> mortgage-backed securities that had been issued in 2006 and put
> an additional 32 securities on watch.  The $5.2 billion of securities
> that were affected, all rated Baa and lower, made up 19% of the
> subprime securities that Moody's rated Baa in 2006.*

FCIC Report at 221 (emphasis added; footnotes omitted).

90.    The same day, Standard & Poor's ("S&P") announced similar comprehensive

rating downgrades of subprime packages and issued credit watch warnings on an array of

---

(. . .footnote continued)

[3]   Notably, on August 9, 2006, Morgan Stanley had acquired Saxon Capital, Inc., a servicer and originator
of residential mortgages, for $706 million, which provided Morgan Stanley with first-hand knowledge of
the deterioration, risks, and fraudulent practices associated with the subprime lending market.

[4]   A CDO is an investment-grade security backed by a pool of bonds, loans and other assets, such as
mortgages.  When a company participates in credit derivative product markets, such as CDOs, it increases
its exposure to credit and liquidity risk.  Morgan Stanley created and controlled a significant amount of
CDOs, backing those CDOs and other credit derivative products with subprime mortgages.

residential mortgage-backed securities.  As the FCIC Report notes, "[t]hese announcements foreshadowed the actual losses to come":

> S&P announced that it had placed 612 tranches backed by U.S. subprime collateral, or some $7.35 billion in securities, on negative watch.  S&P promised to review every deal in its ratings database for adverse effects. ....  The following day, Moody's placed 184 tranches of CDOs, with original face value of about $5 billion, on watch for possible downgrade.  Two days after its original announcement, S&P downgraded 498 of the 612 tranches it had placed on negative watch.  Fitch Ratings, the smallest of the three major credit rating agencies, announced similar downgrades.

FCIC Report at 242 (footnotes omitted).

91.    The financial markets immediately understood the impact of the rating agencies actions:

> *These actions were meaningful for all who understood their implications.*  While the specific securities downgraded were only a small fraction of the universe (less than 2% of mortgage-backed securities issued in 2006), investors knew that more downgrades might come.  Many investors were critical of the rating agencies, lambasting them for their belated reactions.  By July 2007, by one measure, housing prices had already fallen about 4% nationally from their peak at the spring of 2006.

FCIC Report at 242 (emphasis added; footnotes omitted).

92.    Thus, the largest investment banks -- including Morgan Stanley -- had long been aware of the subprime crisis.  As the FCIC Report notes, industry observers had known for "many, many months" about the alarming rate of subprime mortgage delinquencies and that the rating agencies had been slow in making these significant downgrades.  On a July 10, 2007 S&P conference call, one hedge fund manager took S&P's managing director to task for waiting so long to act upon information that the industry had long-known:

> On a July 10 conference call with S&P, the hedge fund manager Steve Eisman questioned Tom Warrack, the managing director of S&P's residential mortgage-backed securities group.  Eisman asked, "I'd like to know why now.  I mean, *the news has been out*

> *on subprime now for many, many months. The delinquencies have*
> *been a disaster now for many, many months. (Your) ratings have*
> *been called into question now for many, many months. I'd like to*
> *understand why you're making this move today when you—and why*
> *didn't you do this many, many months ago.  . . .* I mean, it can't
> be that all of a sudden, the performance has reached a level where
> you've woken up."

FCIC Report at 242 (emphasis added; footnotes omitted).

93.     On July 31, 2007, two Bear Stearns hedge funds, the High-Grade Fund and

Enhanced Leverage Fund, which specialized in MBS, filed for bankruptcy.

94.     On August 3, 2007, Bear Stearns held an impromptu investor teleconference in an

attempt to assuage the market that the bankruptcy filings were not cause for concern.   The

teleconference only made matters worse, as the FCIC Report notes:

> To reassure investors that no more shoes would drop, Bear invited
> them on a conference call that same day.   The call did not go well.
> By the end of the day, Bear's stock slid 6%, to $108.35, 36%
> below its all-time high of $169.61, reached earlier in 2007.

FCIC Report at 282 (footnotes omitted).

95.     On August 9, 2007, the market was further disquieted to learn that American

International Group ("AIG") was deeply exposed to risk in the subprime market when it publicly

disclosed that it had issued $79 billion in credit default swaps (essentially credit insurance) on

the super-senior tranches of CDOs, and "acknowledged that the great majority of the underlying

bonds thus insured--$64 billion--were backed by subprime mortgages.   Of this amount, $19

billion was written on CDOs predominantly backed by risky BBB-rated collateral."   FCIC

Report at 268 (footnotes omitted).

96.     In August and September 2007, the subprime crisis continued to snowball.   For

example:

- The Commerce Department announced housing starts were down 19.4%
over the previous 12 months.   It also announced is a 7.5% plunge in

permits to build new homes, the largest monthly decline since January 1995. Permits were 25.2% below their level a year ago, reflecting continued pessimism among builders over the near-term outlook for new homebuilding.

- On August 9, 2007, AIG, one of the biggest U.S. mortgage lenders, warned that mortgage defaults were spreading beyond the subprime sector with delinquencies becoming more common among borrowers in the category just above subprime.

- On August 16, 2007, Countrywide Financial Corp., the nation's largest mortgage lender, drew down $11.5 billion from its credit lines.

- RealtyTrac Inc. announced foreclosures were up 93% in July 2007 from July 2006. The national foreclosure rate in July was one filing for every 693 households. There were 179,599 filings reported last month, up from 92,845 a year earlier.

- On September 6, 2007, the Mortgage Bankers Association released a quarterly report showing that the delinquency rate (the number of people behind in their payments but have not yet entered the foreclosure process) for mortgage loans on one-to-four-unit residential properties was 5.12% of all loans outstanding in the second quarter of 2007, up 28 basis points from the first quarter of 2007, and up 73 basis points from the previous year. The delinquency rate for subprime loans was up from 13.77% in the first quarter to 14.82% in the second quarter. The delinquency rate for prime loans rose from 2.58% to 2.73%. Compared to this time last year, the seriously delinquent rate was 23 basis points higher for prime loans and 304 basis points higher for subprime loans.

- On September 14, 2007, Merrill Lynch & Co. ("Merrill Lynch"), the biggest underwriter of CDOs, signaled that the subprime mortgage crisis would negatively impact its third-quarter earnings. It reported that it made "fair value adjustments" for potential losses to date on unspecified holdings and financing commitments. Three days later, Merrill Lynch's $1.3 billion bet on subprime lending took a turn for the worse when it confirmed job cuts at its First Franklin Financial Corp. subprime lending unit. Moreover, reports filed with U.S. banking regulators showed that Merrill Lynch Bank & Trust Co., where a lot of the First Franklin franchise was housed, lost $111 million through the first half of 2007.

- Impac Mortgage Holdings Inc. said it would quit most lending activities, while Accredited Home Lenders Holding Co. posted a major quarterly loss and said its survival remained doubtful.

97.     On September 19, 2007, Morgan Stanley issued a press release announcing its results for the third quarter ended August 31, 2007, reporting a 7% decrease in income from the third quarter of the previous year.  Commenting on Morgan Stanley's third quarter results, in the September 19, 2007 press release, defendant Mack admitted that Morgan Stanley was being affected by the "turbulent market."  Morgan Stanley Stock closed that day at $67 per share.

98.     On information and belief, the effect of the "turbulent market" was not limited to Morgan Stanley's own trading in subprime securities.  It included the persuasive risk that Morgan Stanley's counter-parties would fail or refuse to perform, as well as the liquidity risk facing Morgan Stanley as a result of tightening in the credit markets as the subprime crisis worsened and its effects spread to the economy more broadly.

99.     In a conference call on September 19, 2007, following the announcement of Morgan Stanley's third quarter results, David Sidwell, Morgan Stanley's CFO, acknowledged the affect that the subprime market had been having on the Company, stating that "markdowns to our loans and commitments led to losses of approximately $940 million reported in our other sales and trading net revenues."  Morgan Stanley was also suffering under the weight of massive credit deterioration, necessitating enormous write-downs of its CDOs.

100.    During its third quarter of 2007, Morgan Stanley took approximately $1.2 billion in write-downs related to leveraged loans.  However, it had yet to take any subprime mortgage-related write-downs, unlike most of the other investment banks which had already taken billions of dollars in write-downs related to the weakening market.  Citigroup Inc. ("Citigroup"), for example, which took more than $6 billion in write-downs in the third quarter, announced its plan to take an additional $8 billion to $11 billion in the fourth quarter.  Morgan Stanley's silence

regarding its subprime exposure led the market to speculate (incorrectly) that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess.

101.     Meanwhile, the subprime market continued to deteriorate.  For example:

- On September 21, 2007, HSBC Holdings announced its plans to close its U.S. subprime unit, Decision One Mortgage, and record an impairment charge of about $880 million. HSBC stated that it no longer believed the mortgage business was sustainable.  Approximately 750 U.S. employees were expected to be affected by the decision.

- On September 27, 2007, Luminent Mortgage Capital, a home-loan investment company, downgraded its second-quarter profit as the company struggled to gain access to credit and bankers seize assets.

- UBS then reported its first quarterly loss in nine years.  The largest wealth manager in the world planned to write down $3.4 billion in its fixed-income portfolio and other departments and to cut 1,500 jobs in its investment bank. The loss was attributed to the spreading credit crisis stemming from the emerging housing depression.

- The credit ratings agency, Moody's Investors Service, reported that subprime mortgage bonds originated in the first half of 2007 included loans going delinquent at the fastest recorded rate.  The Moody's report predicted that accelerating delinquencies from 2007 bonds are likely to surpass the number of delinquencies in 2006, which hit a peak not seen since 2000.

102.     On October 11, 2007, Countrywide Financial Corp. reported that September mortgage lending was down 44.3% from a year earlier.  Funding for adjustable-rate mortgages fell 76%, which was still lower than the 92% decline in nonprime loan funding.  Delinquencies as a percentage of unpaid principal balances rose 1.81% to 5.85% from a year earlier.

103.     On October 11, 2007, Morgan Stanley announced that Colm Kelleher would officially take over for Sidwell as the Executive Vice President and CFO of Morgan Stanley. *See* Form 8-K, October 2007, at 2.

104.     On October 18, 2007, S&P cut the credit ratings on $23.35 billion of securities backed by pools of home loans offered to borrowers during the first half of the year. The

downgrades even hit securities rated "AAA," which is the highest of the 10 investment-grade ratings and the rating of government debt.

105.   Awareness that the subprime market had infiltrated the entire financial system was furthered on October 24, 2007 "when [Merrill] announced that third quarter earnings would include a $6.9 billion loss on CDOs and $1 billion on subprime mortgages -- $7.9 billion in total, the largest Wall Street write-down to that point, and nearly twice the $4.5 billion loss that the company had warned investors to expect just three weeks earlier.  Six days later, [Merrill's] embattled CEO Stanley O'Neal, a 21-year Merrill veteran, resigned."  FCIC Report at 257.

106.   On November 7, 2007, Morgan Stanley issued a press release announcing that it would write down the value of its subprime mortgage-related exposure by $3.7 billion, due to "continued market deterioration" since August 2007.  Morgan Stanley attributed the loss to deterioration in capital markets, triggered in large part by the struggles of thousands of homeowners to keep up with mortgage payments.  Morgan Stanley further explained that the actual hit to its fourth-quarter results would depend on future market developments and could differ from the amount noted.  "It is expected that market conditions will continue to evolve, and that the fair value of these exposures will frequently change and could further deteriorate."  Morgan Stanley stock closed that day at $51 per share.

107.   According to an article published by the *Wall Street Journal* on November 19, 2007, the biggest piece of the $3.7 billion in pretax paper losses, as Morgan Stanley's data indicated, came from a write-down of the CDO position from $11.4 billion on August 28 to $8.3 billion on October 31.  Such securities fell as much as 4.4% in August and 4.5% in September, but tumbled as much as 27% in October.  Kelleher further noted that the mortgage-related bets "did not come out of our client-facing activities" such as underwriting; rather, Morgan Stanley

"began with a short position in the subprime asset class, which went right through to the first quarter."

108.    As the economy worsened, Morgan Stanley's exposure to subprime losses grew. And as the downturn spread to the senior CDO holdings that were meant to hedge the subprime bet, Morgan Stanley's exposure changed "from short to flat to long." In the same November 19 *Wall Street Journal* article, CFO Kelleher is quoted as saying, "[y]ou go short, expecting a certain predefined range of losses . . . that range of losses was burnt through by the excessive market action. And then you ended up effectively going long." Kelleher explained that one of Morgan Stanley's problems with its residential exposure in recent months was the weakening of its hedging positions as the market plunged far deeper than risk-management models had predicted.

109.    Speculation by investors that Morgan Stanley had gone relatively unscathed in the subprime mortgage mess was immediately dashed and the gravity of the situation weighed on the stock, contributing to an eventual broad sell-off in the market. S&P changed its outlook on Morgan Stanley to negative from stable after the bank said it would write down $3.7 billion in securities backed by residential mortgages. A negative outlook indicates that a ratings cut is likely over the next two years. S&P rated Morgan Stanley's senior unsecured debt "AA-minus," the fourth-highest investment grade. Fitch Ratings also affirmed its ratings of "AA-minus" on the bank, saying the loss was manageable. Fitch placed a negative outlook on Morgan Stanley. Home Equity Wire, "*MS Hit on Subprime Exposure*," November 15, 2007.

110.    That particular loss was a result of increased risk-taking in proprietary trading at the bank, S&P said in a statement. "This misstep points to the increased risk Morgan Stanley bears owing to management's growth strategy and, more broadly, increased trading risks for all

the broker-dealers in the current environment." *Id.* However, Morgan Stanley's exposure to subprime risk was by no means confined to its own proprietary trading. Nor was that particular los of $3.7 billion the full extent of subprime loss at Morgan Stanley.

111.     Moody's Investors Service also cut the ratings on 86 classes of Morgan Stanley mortgage securities while placing another 37 tranches under review on November 9, 2007. "The ratings were downgraded and placed under review for downgrade based on higher than anticipated rates of delinquency, foreclosure, and ROE in the underlying collateral relative to credit enhancement levels," Moody's reported. *See* Reuters Limited, "*Moody's Cuts Morgan Stanley Alt-A Mortgage Securities,*" November 9, 2007. The article further noted that the collateral backing of the deals consists of first lien fixed and adjustable-rate, Alt-A mortgage loans which were originated in late 2005 through 2006. *Id.*

112.     On November 13, 2007, Morgan Stanley participated in a Merrill Lynch Banking and Financial Services Investor Conference Call in which it noted that it expected revenue and common equity growth to decline in 2008 amid a more challenging environment. "While we expect 2008 to be another growth year, we do not expect the current growth trajectory in revenue and average common equity to continue," Kelleher said during the call. "We plan to be more judicious in how we allocate capital, to ensure the highest risk-return in this environment," he said. According to Kelleher, Morgan Stanley intended to "bring down" its balance sheet to keep leverage levels on par with previous quarter. Mr. Kelleher also said that Morgan Stanley expects "the market to take longer, several quarters, to return to more normal operating levels. Demand for CDOs will remain muted, hobbling the structured finance business "for an extended period."

113.     On November 29, 2007, Zoe Cruz was terminated as Co-President of Morgan Stanley and CEO and President of MS&Co: "Morgan Stanley, its reputation battered over a

recent $3.7 billion loss linked to subprime mortgages, has become the latest Wall Street firm to force the retirement of a senior banking executive . . . . The move represents a sharp reversal for John Mack, the chief executive, who had supported and cultivated the career of Cruz. . . ." *Subprime woes claim Morgan Stanley career*, International Herald Tribune, Dec. 1, 2007.

114.   On December 19, 2007, just a month after announcing the $3.7 billion loss, Morgan Stanley issued a press release reporting its results for the fourth quarter of 2007 and for its fiscal year ended Nov. 30, 2007.  Most significantly, Morgan Stanley announced that it was taking *an additional $5.7 billion mortgage-related write-down*, resulting in *a total write down related to mortgages of $9.4 billion*.  One analyst called this news "a 'complete breakdown' in the company's risk-management."   David Ellis, *More Woes for Morgan Stanley*, CNNMoney.com, December 20, 2007.  In addition, Morgan Stanley reported record decreased income of $2.5 billion, down from $6.3 billion the previous year.  Similarly, net revenues were down 6% from the previous year.  In the December 19, 2007 press release, commenting on Morgan Stanley's fourth quarter and 2007 fiscal year, defendant Mack not only admitted that the Company has a disappointing quarter but also accepted accountability for the unsatisfactory results.  Morgan Stanley stock closed that day at $50 per share.

115.   After the announcement of its fourth quarter results on December 19, 2007, Morgan Stanley held a conference call to discuss Morgan Stanley's performance.  Kelleher and Chairman and defendant Mack represented Morgan Stanley on the call.  Mack reported the following regarding Morgan Stanley's additional write-downs:

> So let's start with the mortgage business.  Let me give you a quick recap of what led to this write-down on our subprime trading position.  We had a large and liquid trade on our book in the deteriorating credit market.  *An early view was to hold the position rather than incur the cost of the unwind, as it was believed we had adequate hedges in place.*  However, the hedges did not

perform adequately in extraordinary market conditions of late October and November; subsequently, given the liquidity of positions, we are now writing it down to these levels.

We have moved aggressively to address these issues. *We've been as transparent as possible about our exposure.* Indeed back in early November, we provided you details on the net exposure of the subprime trading position in our mortgage business. We did tell you that as of October 31, we expected to take a 3.7 billion write-down of this subprime position. We also made clear that our year-end marks were dependent on market conditions.

During the month of November, the value of that position continued to deteriorate. It led us to write down another 4.1 billion on the subprime trading position in the fourth quarter. We were also taking a write-down of 1.6 billion on other mortgage related assets that had suffered deterioration in value as a result of dislocations in the mortgage market. And Colm will take you through that later on.

Virtually all write-downs this quarter were the result of trading by a single desk in our mortgage business. *But I want to be absolutely clear, as a head of this firm, I take responsibility for performance.*

(Emphasis added.)

116.    Despite these public statements, Morgan Stanley was aware that its capability of hedging against the risk of its new complex transactions was weak, and that the billions of dollars in write-downs were the result of both the down-turn in the subprime mortgage market and Morgan Stanley's lack of proper accounting procedures to accurately assess its true risk exposure.

117.    Following these dismal results, S&P downgraded Morgan Stanley and placed its rating on Morgan Stanley on "CreditWatch," commenting that "'MS' dismal fourth-quarter results heighten our concern regarding its strategic direction and risk appetite." *S&P: Morgan Stanley 'AA-/A-1+' Ratings Put On CreditWatch*, Market News Publishing, December 19, 2007.

118.   On December 22, 2007, The Financial Times reported that Morgan Stanley was reviewing the position of chief risk officer Tom Daula:  "A person close to Colm Kelleher, Morgan Stanley's chief financial officer, said the bank was 'evaluating the risk function, including the top of that function' and looking at switching the reporting lines for risk management to Mr. Kelleher. . . .  The decision on Mr. Daula's future will shed light on whether the blame for the losses is seen to lie with people monitoring the risk or with more senior executives."  Henry Sender, Financial Times, *Morgan Stanley reviews position of risk officer over writedowns*, Dec. 22, 2007, at 15.  The article further states that "Mr. Daula's supporters within the bank say his repeated warnings were ignored."  *Id.*

119.   In this environment, with subprime issues reverberating throughout the financial world and a banking crisis looming, on or about January 2, 2008 (the first day of the Class Period) defendant Mack, on information and belief, made the decision to fund all Company Contributions to the Plans for the 2007 year solely in Company Stock.  Morgan Stanley stock closed that day at $51 per share.

120.   On January 29, 2008, Morgan Stanley filed its 2007 Form 10-K for the fiscal year ended November 30, 2007 ("MS 2007 Form 10-K").  In that 10-K filing, the Company stated:

> The Company recorded $9.4 billion in mortgage-related writedowns in the fourth quarter of fiscal 2007, including $7.8 billion relating to our U.S. subprime trading positions and $1.6 billion relating to other mortgage-related products, such as commercial mortgage-backed securities, ALT-A and other loans, conduit and non-performing loans and European non-conforming loans, and an impairment charge related to mortgage-related securities portfolios in our domestic subsidiary banks.  We continue to have exposure to these markets and products and as market conditions continue to evolve the fair value of these mortgage-related instruments could further deteriorate.  ***In addition, recent market volatility has made it extremely difficult to value certain of our securities.***

37

MS 2007 Form 10-K at 14 (emphasis added).  Morgan Stanley stock closed that day at $49 per share.

### The Downfall of Bear Stearns

121.   On March 11, 2008, rumors of liquidity problems at Bear Stearns began to circulate.  As the rumors took hold, concern grew among investors that Bear Stearns would not be able to "make good" on its trade positions.  A run on the bank ensued, and by March 13, Bear Stearns' cash position fell to only $2 billion.  FCIC Report at 287-88.

122.   For some time, Bear Stearns had been a heavy participant in what is known as the "repo-market" ("repo" being the abbreviation for "repurchasing agreement"), receiving overnight loans which it repaid each morning.  A default by Bear Stearns would therefore have wreaked havoc on already-battered capital markets because "if other investors questioned the safety of loans they made in the repo market, they could start to withhold funds from other investment banks and companies."  Robin Sidell, *et al.*, "*The Week That Shook Wall Street: Inside the Demise of Bear Stearns*," March 18, 2008, Wall Street Journal.  Morgan Stanley was one such investment bank facing a liquidity crisis if the repo market deteriorated.

123.   Due to interconnectedness of the financial institutions and the fragile state of the economy, the collapse of Bear Stearns was viewed by the U.S. government as a major threat to the U.S. economy.  As explained in the *Wall Street Journal* in the March 18 article:  "A year ago, Mr. Paulson wouldn't have considered Bear Stearns big enough that its collapse would present a threat to the U.S. financial system.  But confidence in the economy and financial sector are so shaky now that he had no doubt that the Fed and government had to act to prevent its bankruptcy, according to a senior Treasury official."

124.   In a highly debated move, the Fed used its authority to extend a short loan to Bear Stearns -- authority it had not used since the Great Depression.  The markets, however, were not

relieved, and lenders grew increasingly tight-fisted.  It became apparent to government officials that Bear Stearns would not survive the weekend.  FCIC Report at 289-90.

125.    On March 16, 2008, the Federal Government intervened at the eleventh hour to keep Bear Stearns from certain failure, brokering a fire-sale to J.P. Morgan Chase.  At the time of its signing, the deal provided that Bear Stearns would be sold at just $2.00 a share, less than 10% of its closing value on the preceding trading day.  Andrew Sorkin, "*JP Morgan Pays $2 a Share for Bear Stearns,*" March 17, 2010, New York Times.  In response to shareholder outrage, JP Morgan ended upon paying approximately $10 per share, still less than half of Bear Stearns' closing price on the preceding trading day.  With the market's sites now fixed on financial companies and the extent of system risk becoming apparent to the market, shares of Morgan Stanley, after trading down over 15 percent intraday, closed at $36 per share, representing a decline of over 8 percent from the previous trading session.

126.    Following the collapse of Bear Stearns, Defendants knew or should have known that the stock of Morgan Stanley was far too risky an investment for the Plans, even though it was still far from clear to the investing public and the participants in the Plans.  As explained by New York Times investigative journalist Andrew Sorkin in his book *Too Big to Fail,*[5] the downfall of Bear Stearns occurred in an environment in which banking institutions had become significantly interconnected, meaning that the failure of one banking institution would almost certainly affect and possibly cripple other banking institutions:

---

[5] *Too Big to Fail,* a highly regarded text covering the 2008 financial crisis, is well founded in first-hand witness accounts and contemporaneous documentation.  As detailed in its Notes and Sources section, Sorkin interviewed hundreds of participants in the events at issue, and was provided a large number of their notes, calendars, emails and video recordings.  Sorkin also incorporated information from countless news articles and various government reports.  *See Too Big to Fail,* Notes and Sources, at 545-586.

> [N]o longer would a bank simply make a loan and keep it on its books. Now lending was about origination, establishing the first link in a chain of securitization that spread risk of the loan among dozens if not hundreds and thousands of parties. *Although securitization supposedly reduced risk and increased liquidity, what it meant in reality was that many institutions and investors were now interconnected, for better and for worse.* ... Making matters worse, many financial firms had borrowed heavily against these securities [which] ... increased the pain when they began to lose value.

*Id.* at 89-90 (emphasis supplied).

127.     Morgan Stanley itself was well aware of the profound risks it would face if another banking institution failed.   As it stated in its Form 10-K for the fiscal year ending November 30, 2008:

> **Defaults by Another Larger Financial Institution**
> **Could Adversely Affect Financial Markets Generally**
>
> The commercial soundness of many financial institutions may be closely interrelated as a result of credit, trading, clearing or other relationships between the institutions.  As a result, concerns about, or a default or threatened default by, one institution could lead to significant market-wide liquidity and credit problems, losses or defaults by other institutions.   This is sometimes referred to as "systemic risk" and may adversely affect financial intermediaries, such as clearing agencies, clearing houses, banks, securities firms and exchanges, with which wed interact on a daily basis, and therefore could adversely affect Morgan Stanley.

128.     Further, with the collapse of Bear Stearns, Morgan Stanley had reason to be deeply concerned with its own financial viability because its business profile, like Bear Stearns', was tied up in the credit markets with its prime brokerage business.  A prime brokerage is the generic name for a bundled package of services offered by investment banks and securities firms to hedge funds and other professional investors needing the ability to borrow securities and cash to be able to invest on a netted basis and achieve an absolute return.  At the time of its collapse, Bear Stearns had been the second-largest prime broker in the United States, with 21% of the

market in 2006.  Morgan Stanley was first, with 23%.  FCIC Report at 280.  In other words, of all the major investment banks, Morgan Stanley most closely resembled the now-defunct Bear Stearns.

129.    As set forth in the FCIC Report, the systemic weaknesses that ultimately felled Bear Stearns -- leverage, reliance on overnight funding, dependence on securitization markets, and concentrations in illiquid mortgage securities and other troubled assets -- were not unique to that firm.  Indeed, following Bear Stearns' fall, bankers and regulators were on notice "that the other investment banks shared Bear's weaknesses."  FCIC Report at 292.  "In particular, the run on Bear had exposed the dangers of tri-party repo agreements and the counterparty risk caused by derivatives contracts."  FCIC Report at 280.  As alleged below, because of its own liquidity demands, Morgan Stanley was particularly susceptible to the risk that befell Bear Stearns.

130.    The "repo" agreements to which the FCIC report refers, are a method of secured lending in which the borrower sells securities to the lender as collateral and agrees to repurchase them at a higher price within a short period, often within a day.  Liquidity at Morgan Stanley, like Bear Stearns and other banks, was highly dependent on such "repos."  Bear Stearns' illiquidity was caused in large part because lenders were not willing to engage in overnight repos with mortgage-based securities that Bear Stearns needed to use as collateral.  Furthermore, as the FCIC Report explains, the repo market used only two clearing banks: JP Morgan, which was the primary repo lender for Bear Stearns, as well as BNY Mellon, which was Morgan Stanley's main clearing bank:

> The tri-party repo market used two clearing banks, JP Morgan and BNY Mellon.  During every business day, these clearing banks return cash to lenders; take possession of borrowers' collateral, essentially keeping it in escrow; and then lend their own cash to borrowers during the day.  This is referred to as "unwinding" the repo transaction; it allows borrowers to change the assets posted as

41

> collateral every day. The transaction is then "rewound" at the end
> of the day, when the lenders post cash to the clearing banks in
> return for the new collateral.

FCIC Report at 283-84.

131.     The tri-party repo borrowing market was highly interdependent, placing each

participant at risk, as the FCIC report explains: "As Bear increased its tri-party repo borrowing,

it became more dependent on JP Morgan, the clearing bank. A risk that was little appreciated

before 2007 was that *JP Morgan and BNY Mellon could face large losses if a counterparty such*

*as Bear defaulted during the day.* Essentially, JP Morgan served as Bear's daytime repo lender."

FCIC Report at 284 (emphasis added).

132.     The Fed was greatly concerned at the time of Bear Stearns' collapse with the risks

faced and posed by tri-party agents.

> The Fed increasingly focused on the systemic risk posed by the
> two repo clearing banks. In the chain-reaction scenario that it
> envisioned, if either JP Morgan or BNY Mellon chose not to
> unwind its trades one morning, the money funds and other repo
> lenders could be stuck with billions of dollars in repo collateral.
> Those lenders would then be in the difficult position of having to
> sell off large amounts of collateral in order to meet their own cash
> needs, an action that in turn might lead to widespread fire sales of
> repo collateral and runs by lenders.

FCIC Report at 295 (citation omitted). Thus, in the Fed's view, either a default in the repo

market by an investment bank like Bear Stearns, or a refusal to unwind by JP Morgan or BNY

Mellon, would trigger catastrophic chain reactions. *Id.* at 284, 295.

133.     Bear Stearns' collapse accelerated the breakdown of the tri-party repo market:

> *The $2.8 trillion tri-party repo market had "really [begun] to*
> *break down,"* [Fed Chairman Ben] Bernanke said. "As the fear
> increased," short-term lenders began demanding more collateral,
> "which was making it more and more difficult for the financial
> firms to finance themselves and creating more and more liquidity
> pressure on them. And, it was heading sort of to a black hole." *He*
> *saw the collapse of Bear Stearns as threatening to freeze the tri-*

> *party repo market, leaving the short-term lenders with collateral they would try to "dump on the market. You would have a big crunch in asset prices."*

FCIC Report at 290-91 (emphasis added).

134.    The repo market is just one example of the interdependence of financial institutions. Regulators also worried about "the interlocking relationships that derivatives created among the small number of large financial firms that act as dealers in the OTC derivatives business." FCIC Report at 299. A derivatives contract creates a credit relationship between parties, such that one party may have to make large and unexpected payments to the other based on sudden price or rate changes or loan defaults. If a party is unable to make those payments when they become due, that failure may cause significant financial harm to its counterparty, which may have offsetting obligations to third parties and depend on prompt payment. *Id.*

135.    Accordingly, where a single default in the repo market could wreak havoc on the markets, so could a single default in the OTC derivatives business. In the repo market, a default (or even rumors of borrower instability) could fell the system by, *inter alia*, causing an extreme clamp-down on overnight loan availability (even for good collateral) and triggering a collateral fire-sale. Similarly, a default in the OTC derivative market could also precipitate a calamitous series of events. FCIC Report at 299-300.

136.    As the FCIC Report explains:

> [R]egulators also worried about the interlocking relationships that derivatives created among the small number of large financial firms that act as dealers in the OTC derivatives business. A derivatives contract creates a credit relationship between parties, such that one party may have to make large and unexpected payments to the other based on sudden price or rate changes or loan defaults. *If a party is unable to make those payments when they become due, that failure may cause significant financial harm to its counterparty, which may have offsetting obligations to third*

43

> *parties and depend on prompt payment.* Indeed, most OTC
> derivatives dealers hedge their contracts with offsetting contracts;
> thus, if they are owed payments on one contract, they most likely
> owe similar amounts on an offsetting contract, creating the
> potential for a series of losses or defaults. *Since these contracts
> numbered in the millions and allowed a party to have virtually
> unlimited leverage, the possibility of sudden large and devastating
> losses in this market could pose a significant danger to market
> participants and the financial system as a whole.*

FCIC Report at 299-300 (emphasis added).

137.    The danger was amplified by two facts. First, "large derivatives positions, and the resulting counterparty credit and operational risks, were concentrated in a very few firms." FCIC Report at 300. Second, "in 2008, the current and potential exposure to derivatives at the top five U.S. bank holding companies was on average three times greater than the capital they had on hand to meet regulatory requirements. The risk was even higher at the investment banks." *Id.* As the FCIC explained, "[t]hese concentrations of positions in the hands of the largest bank holding companies and investment banks posed risks for the financial system because of their interconnections with other financial institutions." FCIC Report at 300.

### Following the Collapse of Bear Stearns, Other Banks, Including Morgan Stanley, Were In Serious Peril

138.    While the investing public seemed to have taken solace in the appearance of a government backstop during the Bear Stearns episode, behind-the-scenes bankers (including Morgan Stanley) remained troubled by the speed of Bear Stearns' collapse. As the FCIC Report observed:

> . . . bankers and their regulators were haunted by the speed of Bear
> Stearns's demise. *And they knew that the other investment banks
> shared Bear's weaknesses: leverage, reliance on overnight
> funding, dependence on securitization markets, and concentrations
> in illiquid mortgage securities and other troubled assets.* In
> particular, the run on Bear had exposed the dangers of tri-party
> repo agreements and the counterparty risk caused by derivatives
> contracts.

44

> And the word on the street—despite the assurances of Lehman
> CEO Dick Fuld at an April shareholder meeting that "the worst is
> behind us"—was that Bear would not be the only failure.

FCIC Report at 292-93 (emphasis added).

139.    As reported in *"Too Big To Fail,"* on March 17, 2008, the first business day after

Bear Stearns was acquired by JPMorgan Chase, Richard Bernstein, "the respected chief

investment strategist for Merrill Lynch ... sent out an alarming note to clients that morning:

'Bear Stearns's demise should probably be viewed as the first of many.  Sentiment is just

beginning to catch on as to how broad and deep the credit market bubble has been.'" *Too Big to*

*Fail*, at 15.

140.    One bank perilously close to the edge following the collapse of Bearn Stearns was

Lehman Brothers.  On March 17, 2008, just one day after Bear Stearns's collapse, after speaking

with Richard Fuld, the CEO of Lehman Brothers, the head of Lehman's London operation told

his team, "I don't think we're going bust this afternoon, but I can't be one hundred percent sure

about that." *Id.*  Morgan Stanley's CEO, defendant Mack, was also well aware of Lehman's

peril.  Indeed, on that day, Fuld had called Mack and told him that two banks were refusing to

trade with Lehman. *Too Big To Fail*, at 15.

141.    On March 17, 2008, in response to the subprime mortgage crisis and the collapse

of Bear Stearns, the Federal Reserve created a new lending facility, known as the Primary Dealer

Credit Facility ("PDCF"), to provide emergency loans to all financial institutions listed as

primary broker-dealers, including Morgan Stanley.

142.    On March 19, 2008, Morgan Stanley announced its results from continuing

operations for the first quarter of ended February 29, 2008, reporting decreased income of $1.551

billion, down from $2.314 billion in the first quarter of 2007.  Similarly, net revenues were down

17% from the previous year's first quarter.  Morgan Stanley stock closed that day at $43 per share.

143.    After the announcement of its first quarter results on March 19, 2008, Morgan Stanley held a conference call to discuss its performance.  Kelleher represented Morgan Stanley on the call and acknowledged there "was a negative $1.1 billion driven primarily by write downs in our lending business and to a lesser extent the U.S. banks liquidity portfolio that we reclassified from available for last quarter."  In other words, Morgan Stanley acknowledged that it was feeling pressure in its ability to borrow funds to operate.  Furthermore, Kelleher addressed Morgan Stanley's approach to risk management and announced that the Company was changing the organization of its risk management team, even though Morgan Stanley had been touting its risk management capabilities and tools for well over a year.

144.    On April 3, 2008, Timothy Geithner, then the president of the New York Federal Reserve, publicly spoke of his concern that the collapse of Bear Stearns was a sign of a systemic problem, testifying before the Senate Committee on Banking, Housing and Urban Affairs that:

> In many respects, conditions worsened materially in February and March. Credit spreads on financial institutions widened, equity prices declined, and market functioning deteriorated sharply. By the early part of March, the threat of a disorderly adjustment was growing.
>
> What we were observing in U.S. and global financial markets was similar to the classic pattern in financial crises. Asset price declines - triggered by concern about the outlook for economic performance - led to a reduction in the willingness to bear risk and to margin calls. Borrowers needed to sell assets to meet the calls; some highly leveraged firms were unable to meet their obligations and their counterparties responded by liquidating the collateral they held. This put downward pressure on asset prices and increased price volatility. Dealers raised margins further to compensate for heightened volatility and reduced liquidity. This, in turn, put more pressure on other leveraged investors. A self-reinforcing downward spiral of higher haircuts forced sales, lower prices, higher volatility, and still lower prices.

46

This dynamic poses a number of risks to the functioning of the financial system. It reduces the effectiveness of monetary policy, as the widening in spreads and risk premium worked to offset part of the reduction in the Fed Funds rate. Contagion spreads, transmitting waves of distress to other markets, from subprime to prime mortgages and even to agency mortgage-backed securities, to commercial mortgage-backed securities, and to corporate bonds and loans. In the current situation, effects were felt in the municipal and student loan markets.

***The most important risk is systemic: if this dynamic continues unabated, the result would be a greater probability of widespread insolvencies, severe and protracted damage to the financial system and, ultimately, to the economy as a whole.*** This is not theoretical risk, and it is not something that the market can solve on its own. It carries the risk of significant damage to economic activity. (Emphasis supplied.)

145.    In April 2008, concern about systemic problems was widespread.  For example, that month, the International Monetary Fund released its Global Financial Stability Report which included the alarming news that mortgage and real estate-related write downs and losses could total $945 billion as of March 2008.

146.    Also in April 2008, Hank Paulson, Secretary of the U.S. Treasury, reportedly told Lehman Brothers' CEO Fuld that he was worried about that news, and that he was "also anxious about the staggering amount of leverage – the amount of debt to equity – that investment banks were still using to juice their return," which he believed added enormous risk to the system.  *Too Big To Fail*, at 81.  Indeed, the amount of leverage among these banks at the time was astonishing.  At the end of the first quarter in 2008, as reported by the Senate Joint Economic Committee "Financial Meltdown and Policy Response," the leverage ratios at Morgan Stanley, Brothers, Merrill Lynch, and Goldman Sachs, were 31.8, 20.7, 27.5, and 26.9, respectively, compared with an average of 8.8 for all U.S. commercial banks and savings institutions.

147.   On April 15, 2008, Secretary Paulson presented the Chairman of the Federal Reserve, Ben Bernanke, a confidential memo that amounted to a plan for what to do in the event of a complete financial meltdown. *Too Big To Fail*, at 83.

148.   Over the coming months the systemic risk threatening all banking institutions, including Morgan Stanley, only grew.  Lehman Brothers was at the forefront of the concerns, but by no means the only investment bank at risk.  On May 21, 2008, David Einhorn, the president of Greenlight Capital, spoke at the Ira W. Sohn Investment Research Conference, a major investor conference, of concerns that Lehman was inflating the value of its real estate assets and unwilling to recognize the true extent of losses out of fear for harm that would do to its stock price. He stated, "My hope is that Mr. Cox and Mr. Bernanke and Mr. Paulson will pay heed to the risks to the financial system that Lehman is creating and that they will guide Lehman toward a recapitalization and recognition of its losses—hopefully before federal taxpayer assistance is required." *Too Big To Fail*, at 108.  Einhorn's comments were broadcast throughout financial circles.

149.   On June 10, 2008, John Thain, CEO of Merrill Lynch, spoke at a conference hosted by *The Wall Street Journal*.  He commented on his industry as follows, "[E]veryone is shrinking their balance sheet.  There was too much leverage in the system, too much credit, for too long…. We all have concerns about what we read in the papers." *Too Big to Fail*, at 134, quoting Joe Bel Bruno, *"Merrill CEO Sees More Industry Consolidation,"* Associated Press, June 10, 2008.

150.   On June 18, 2008, Morgan Stanley announced its results from continuing operations for the second quarter ended May 31, 2008, reporting decreased income of approximately $1 billion, compared with $2.3 billion in the second quarter of 2008.  Similarly,

net revenues were 38 percent below the previous year's second quarter. Although the Company posted a profit, there were losses totaling $1.182 billion attributable to mortgage, credit and asset management related activities. Morgan Stanley stock closed that day at $40 per share.

151.    On June 19, 2008 *The Wall Street Journal* reported that Morgan Stanley's poor fiscal second quarter was a result of "bad trades, poor management and investments, as well as less than stellar risk management." David Reilly and Peter Eavis, *Bad Trades, Woes in Management Risk, The Wall Street Journal*, June 19, 2008. The report further cautioned, "it is tough to justify Morgan Stanley's premium until the firm shows that it has the basics under control and can prevent its traders from causing whiplash volatility." *Id.*

152.    On July 3, 2008, Paulson gave a speech in London at Chatham House, an international affairs research group, at which he stated that "the near-collapse of Bear Stearns Cos. highlights the need for a formal procedure that allows large, nonbank financial institutions to fail without wreaking havoc on the broader financial markets and the U.S. economy." Deborah Solomon, "*Paulson Seeks a System to Handle Orderly Failure of Financial Firms*," *The Wall Street Journal*, July 4, 2008.

153.    When Morgan Stanley filed its Form 10-Q for the fiscal quarter ended May 31, 2008, with the SEC on or about July 8, 2008, Morgan Stanley reported approximately $179 billion of liquidity for its ongoing operations. Morgan Stanley claimed that it managed liquidity to provide "adequate funding over a wide range of market environments."

154.    At the time, Morgan Stanley was highly dependent upon so-called "free credit," which consisted of prime brokerage customer deposits, to fund its operations. By the end of August 2008, Morgan Stanley's $179 billion of liquidity included approximately $129 billion— or three-quarters of its total liquidity—of free credit in the form of prime brokerage deposits.

155.   In early July 2008, Lehman Brothers' CEO Fuld held a meeting at defendant Mack's house, which included several of Morgan Stanley's senior executives, and suggested selling various of Lehman's most significant assets to Morgan Stanley.  The meeting apparently ended awkwardly, with Mack wondering afterward whether Fuld was "offering to merge with us?" *Too Big to Fail*, at 192.

156.   Morgan Stanley had particular reason to be aware of the depth of the financial crisis, which was driven in large part by the deterioration of the housing market, because in August 2008, it was retained by the Treasury Department to advise the government as to what to do about the failing Freddie Mac and Fannie Mae.  Morgan Stanley undertook "a loan-by-loan analysis of the two mortgage giants ... [analyzing] nearly half the mortgages in the entire United States." *Too Big to Fail*, at 222.  Morgan Stanley quickly determined that these banks' thin capital cushion was at risk.  Ultimately, Fannie Mae and Freddie Mac were placed into conservatorship of the Federal Housing Finance Agency ("FHFA"), an action which the FHFA's director, James B. Lockhart, described as "one of the most sweeping government interventions in private financial markets in decades."

157.   On September 7, 2008, Fannie Mae and Freddie Mac were placed into conservatorship.

**The Fall of Lehman Brothers**

158.   On September 15, 2008, Lehman Brothers fell to the inevitable pressures of a collapsing credit market and, despite massive regulatory and industry efforts, it ceased operations and filed for bankruptcy.  This was both a symptom and a profound indicator of the risk that was also threatening Morgan Stanley.  Indeed, just a few days before, Jamie Dimon, CEO of JPMorgan, told a large group of members of his management team:  "We need to prepare right now for a Lehman Brothers filing... And for Merrill Lynch filing... And for AIG filing... And

for Morgan filing… and potentially for Goldman Sachs filing." *Too Big to Fail*, at 3. Paulson described that day as "an economic 9/11," and stated that the entire economy was on the verge of collapsing. *Id.* at 417.

159.    News that the federal government would not bail Lehman Brothers out, combined with reports that Merrill Lynch on Sunday, September 14, 2008 had arranged to be sold to Bank of America, put the precarious condition of Morgan Stanley squarely and immediately in the focus of regulators and investors alike.   As Mack told the FCIC, "as soon as we come in on Monday, [September 15, 2008], we're in the eye of the storm with Merrill gone and Lehman gone." FCIC Report at 360.  Mack would later state in a January 2010 written submission to the FCIC that "in the immediate wake of Lehman's failure on September 15, Morgan Stanley and similar institutions experienced a classic 'run on the bank,' as investors lost confidence in financial institutions and the entire investment banking model came under siege."  Mack also later acknowledged to the FCIC that by September 15 -- with Lehman gone and Merrill Lynch sold off – he believed that Morgan Stanley was "next in line." *Id.*

160.    Of course, given Morgan Stanley's advance knowledge that Lehman was on the brink of collapse and its understanding that the financial problem was a systemic one, Defendants knew or should have seen the risk of this occurring well before Lehman Brothers' bankruptcy filing.  Morgan Stanley's stock traded at the end of the day at $32 per share.

161.    By the time Lehman Brothers filed for bankruptcy, credit at Morgan Stanley was already brutally tight.  It had become a daily occurrence that:

> At 2:45 p.m., hedge funds would start pulling money out of their prime brokerage accounts, asking for all the credit and margin balances.  At 3:00 the Fed window would close, leaving the firm without access to additional capital until the following morning. Then, at 3:02, the spread on Morgan Stanley's credit default swaps – the cost of buying insurance against the firm's defaulting –

51

would soar. Finally, its clearing bank, JP Morgan, would call and ask for more collateral to protect it.

*Too Big To Fail*, at 420.

162.   Also on September 15, 2008, underscoring the pervasive risk of a run on the bank at Morgan Stanley, Morgan Stanley's London office began reporting that several European banks had indicated that they were no longer willing to accept Morgan Stanley as a counterparty on derivative trades. Although Morgan Stanley was able to convince these banks to agree to keep these trades -- at least for the time being -- Morgan Stanley was acutely aware that it was vulnerable to the same market rumors about the flight of derivative counterparties that helped lead to the collapse of both Bear Stearns and Lehman Brothers. FCIC Report at 360-61.

163.   On September 15, Morgan Stanley became the subject of a $10 billion run by hedge funds, which became worried -- in light of the Lehman experience -- that their clients' assets could be frozen or otherwise dissipated in a potential bankruptcy of a prime broker entity like Morgan Stanley. Hedge funds began transferring their funds to bank holding companies (like JP Morgan), large foreign banks (like Deutsche Bank and Credit Suisse), and custodian banks (like BNY Mellon and Northern Trust). FCIC Report at 361-62. By the following Wednesday, September 17, 2008, on news of AIG's bailout, the hedge funds had upped their demands on Morgan Stanley to $32 billion. By week's end, hedge funds had removed $86 billion from Morgan Stanley. FCIC Report at 360-62.

164.   Immediately after Lehman declared bankruptcy on September 15, 2008, Morgan Stanley executives began estimating the use of the PDCF in the event of a loss of liquidity. At the time, David Wong, Morgan Stanley's Treasurer, and other Morgan Stanley executives informed the Federal Reserve that a loss of $10-$15 billion of liquidity over the ensuing two

weeks would be a "dark scenario" for the bank, requiring at least $10 billion of emergency funds, and they described a loss of $21.1 billion over that same two-week period as "catastrophic."

165.    On September 15, 2008, prime brokerage deposits started to pour out of Morgan Stanley at an alarming rate.   Hedge fund depositors withdrew approximately $7 billion in deposits from Morgan Stanley on September 15, 2008.  So troubling were the withdrawals, that Mr. Wong called William Brodows, a bank supervisor with the New York Fed, *at home* that evening to advise him of the "adverse funding flows from prime brokerage accounts." *Bloomberg News*, August 22, 2011.

166.    On the following day, September 16, 2008, another $13 billion of prime brokerage deposits were withdrawn from Morgan Stanley as hedge funds continued to withdraw cash from the brokerage.   Thus, by the day after Lehman's bankruptcy, Morgan Stanley had reached what its own executives termed a "catastrophic scenario" for the Company.

167.    On September 17, 2008, as the "run on the bank" accelerated, Morgan Stanley lost another $41.3 billion of prime brokerage deposits, for a total loss of liquidity of $61.3 billion over the three-day period—approximately three times higher than the "catastrophic scenario" described by Morgan Stanley's executives to the Federal Reserve.

168.    Morgan Stanley continued to experience withdrawals of prime brokerage deposits for the rest of the week following Lehman's bankruptcy.   On September 19, 2008, Citigroup executives told Federal Reserve staffers that Goldman Sachs and Credit Suisse were actively pursuing Morgan Stanley's brokerage customers.

169.    During this time, Morgan Stanley was repeatedly forced to return to the Fed's PDCF for funding, borrowing $27 billion on September 17, 2008 and $35.3 on September 19, 2008 just to avoid defaulting on its market commitments. FCIC Report at 361.

53

170.    On September 15, 2008, the annual cost of insuring Morgan Stanley spiked, nearly doubling by the end of the day.   Indeed, the credit default swap prices reflected the increased risk that Morgan Stanley was in imminent danger of collapse.   Financial Express Article, September 19, 2008.

171.    During this time, Morgan Stanley was engaged in repo agreements with JP Morgan and BNY Mellon.   As alleged above, under a repo one party lends cash to another party and, in exchange, securities are posted as collateral by the borrower.   When the agreement expires, the borrower pays back the loan principal with interest and the lender returns the collateral.   Sensing a liquidity crisis, JP Morgan and BNY Mellon grew concerned and began requesting additional collateral to decrease their exposure to Morgan Stanley.   On September 18, 2008, BNY Mellon requested $3 billion in collateral, and JP Morgan was considering requiring an additional $2.8 billion on top of the $2.2 billion already on deposit.   FCIC Report at 361-62.

172.    While clients and third-party lenders were severely depleting their liquidity, Morgan Stanley's ability to write short-term commercial paper nearly came to a halt.   While it was customary for Morgan Stanley to roll over $240 million in commercial paper each day, for the rest of September it rolled over a mere $20 million of the short-term financing.   FCIC Report at 362.

173.    On September 16, 2008, the next business day after the collapse of Lehman Brothers, Morgan Stanley's stock fell by 28% in a matter of hours.   *Too Big To Fail*, at 410. However,

> Apart from the new anxiety about money market funds and general nervousness about investment banks, [Mack] was facing a more serious problem than anyone on the outside realized: at the beginning of the week, Morgan Stanley had $178 billion in the tank – money available to fund operations and to lend to their major hedge fund clients. But in the past twenty-four hours, more

> than $20 billion of it had been withdrawn, as hedge fund clients
> demanded it back, in some cases closing their prime brokerage
> accounts entirely.

*Id.* at 410-11. As Walid Chammah, then co-president of Morgan Stanley put it to Mack, "the

money's walking out of the door." *Id.* Though it was Chammah who had persuaded Mack to

continue wiring money, as requested, to withdrawing hedge funds, at that point, Chammah noted,

"We can't do this forever." Morgan Stanley's stock closed that day at $28 per share.

174.    That night, facing the prospect of Morgan Stanley's own collapse, Mack was

contacted by senior executives at Citigroup, and began to explore the idea of a merger between

Morgan Stanley and Citigroup. His concern about the future of Morgan Stanley was evident in

his responses to Citigroup's overtures, "It's tough out there ... we're looking at our options."

*Too Big To Fail,* at 412. The next day, however, Citigroup withdrew its expression of interest in

Morgan Stanley. *Id.* at 416.

175.    On September 17, 2008, CFO Kelleher told Mack, *"we're going to be out of*

*money on Friday."* Mack had him recheck the numbers. After the recheck, Kelleher told Mack,

*"Maybe we'll make it through early next week." Too Big To Fail,* at 427-28 (emphasis added).

176.    Also on September 17, 2008, Kevin Warsh, a governor at the Federal Reserve,

was concerned that Morgan Stanley was losing confidence in the marketplace, and thus needed

to buy a bank with large deposits. With his prompting, Morgan Stanley began to consider a

potential acquisition of Wachovia. *Too Big To Fail,* at 414-15.

177.    By September 18, Mack admittedly recognized the problems besieging Morgan

Stanley Stock. He made a speech to all Morgan Stanley employees, stating:

> I know some of you are very scared – well, maybe all of us are
> very scared. You want to sell stock, sell your stock. I'm not going
> to look at it and I don't care. I'm not selling, and there, well, John,
> you've got a lot of it, you don't have to worry about it ... ah, you
> know, I do have a lot, and I do worry about it, but I really care

much more about your getting peace of mind.  So if you want to
sell, sell.  Do it.

*Too Big To Fail,* at 430-31.

178.    On September 18, 2008, defendant Mack was advised by CFO Kelleher that
Jamie Dimon, the CEO of JPMorgan had called "to see if he could be of help." *Too Big To Fail,*
at 437.  Mack called Dimon back and was again told that Dimon was "trying to be helpful." *Id.*
at 438.  Mack hung up without finding the nature of the "help" offered.  Mack, as he explained in
a September 2009 speech to the Wharton School, viewed this as an information gathering
exercise by Dimon.

179.    Also on September 18, 2008, Secretary Paulson and other Treasury officials met
with President Bush and several senior white house staffers.  Secretary Paulson told President
Bush that "If we don't act boldly... we could be in a depression deeper than the Great
Depression." *Too Big To Fail,* at 440.  Bernanke agreed with this statement.

180.    That day, Morgan Stanley stock had rocketed wildly, dropping 46%, then
rebounding to close up 3.7%.  As detailed in *Too Big to Fail,*

> [Mack] knew, though, that beneath the surface the firm was
> hurting. Hedge funds continued to seek redemptions. Other banks
> were buying insurance against Morgan Stanley's going under,
> covering more than $1 billion. Within the past two days, Merrill
> Lynch had bought insurance covering $150 million in Morgan
> debt. Citigroup, Deutsche Bank, DBS, AllianceBernstein, and
> Royal Bank of Canada had all made similar moves to protect
> themselves from a collapse.

> Mack knew that what the firm needed most was an investor to step
> up and take a big stake in the company to shore it up. "I don't
> know how this happened," he confided in Nides ... Morgan
> Stanley had been considered too conservative and Mack pushed
> the firm to take on more risk at exactly the wrong moment. And
> now here they were, in the perfect storm, on the cusp of
> insolvency.

*Id.* at 444.  Morgan Stanley stock closed that day at $22 per share.

181.    That evening, Secretary Paulson and Chairman Bernanke met with the congressional leadership.  Bernanke stated to the twenty-four congressmen gathered, when introducing the idea of the funding they would eventually seek as the Troubled Asset Relief Program ("TARP"): "I spent my career as an academic studying great depressions. I can tell you from history that if we don't act in a big way, you can expect another great depression, and this time it is going to be far, far worse." *Too Big To Fail*, at 443.

182.    At this point, Morgan Stanley was in wholehearted pursuit of a major investor.  In fact, Mack was reported to have told a Citigroup executive "we need a merger or we're not going to make it." *Too Big To Fail*, at 445.  The only entity Mack thought might be interested was China Investment Corporation ("CIC"), China's first sovereign wealth fund.  Mack was so concerned that a deal be reached that he contacted Secretary Paulson for help in negotiating with CIC.  Secretary Paulson indicated that he would see if President Bush would be willing to call China's president to promote a transaction. *Id.* at 445.

183.    In a speech he gave a year later to the Wharton School,[6] Mack described the events the following weekend: "By Friday [September 19, 2008] we were getting nowhere [with respect to finding a way to raise money].  We'd been turned down at every place we'd gone." It was then that Morgan Stanley began to consider becoming a bank holding company as a way of obtaining additional liquidity.  As Mack further stated in that speech, however, he was not confident that such an action would be sufficient to save Morgan Stanley.

---

[6] A video of this speech is available at http://community.cengage.com/GECResource/blogs/gec_blog /archive/2009/10/15/john-mack-on-morgan-stanley-on-the-brink-after-lehman-collapse.aspx.

184.    On Friday, September 19, 2008, Secretary Paulson announced to the press the

plan he hoped to sell to Congress, which came to be known as TARP.  He urged the press to

understand the necessity of such a program, stating,

> The underlying weakness in our financial system today is the
> illiquid mortgage assets that have lost value as the housing
> correction has proceeded.  These illiquid assets are choking off the
> flow of credit that is so vitally important to our economy.  When
> the financial system works as it should, money and capital flow to
> and from households and businesses to pay for home loans, school
> loans, and investments that create jobs.  As illiquid mortgage assets
> block the system, the clogging of our financial markets has the
> potential to have significant effects on our financial system and our
> economy.

Morgan Stanley was at least as exposed to this risk as any other investment bank.  Indeed, it was

more exposed then most.  In his speech to the Wharton School, Mack acknowledged that after

Lehman collapsed *"I knew that Morgan Stanley would be next in line,"* a sentiment that was

widely held on Wall Street because of the bank's capital structure and risk profile, as alleged

above.

185.    The announcement by Paulson on September 19, that he would be seeking

congressional approval of TARP, gave no assurance to Mack that Morgan Stanley did not have

to move quickly to complete a deal.  To the contrary, he still believed that he had to achieve

something by the weekend or Morgan Stanley could follow Lehman into collapse.  *Too Big To

Fail*, at 448.  Morgan Stanley continued to scramble for funding.  That day, Morgan Stanley

learned that the transaction it had been considering with Wachovia would be far more expensive

and risky than anticipated.  To make it work, Morgan Stanley would have to raise $20 to $24

billion in equity to capitalize the combined firm, an amount that, in the conditions of the market

at the time, could not be raised.  After a few hours of due diligence, it became clear that there

was not much momentum from Wachovia either, and due diligence was halted.  *Id.* at 450.

186.    Simultaneously, Morgan Stanley negotiated with Mitsubishi UFJ, Japan's largest bank, for it to buy a stake in Morgan Stanley, as well as with CIC, the Chinese fund.  CIC made an offer for 49% of Morgan Stanley for a credit line of as much as $50 billion, and an equity investment of, at most, $5 billion, an offer that was considered so bad that some at Morgan Stanley thought they had misheard it.  *Too Big To Fail*, at 451.  "However insulting Gao's proposal, defendant Mack recognized that his situation was desperate. Despite the market rally, the firm had continued to bleed cash." *Id.* at 453.  On that day alone, Morgan Stanley had more than $22 billion in outflows from its prime brokerage unit, and a $9.3 billion decrease in its liquidity pool.

187.    That same day, Secretary Paulson was extremely concerned about Morgan Stanley. He told Mr. Geithner that defendant Mack was "holding onto a slim reed," and had only approximately $30 to 40 billion left.  *Too Big To Fail*, at 456.  In Paulson's view, both Morgan Stanley and Goldman Sachs were in need of a lifeline.  *Id.*  The sentiment was the same at the Federal Reserve Bank of New York.  Amy White of that institution wrote, in a September 19, 2008 email to several of its senior officials, "Morgan is the 'deer in the headlights' and having significant stress in Europe."  She further commented that "Morgan is looking like Lehman did a few weeks ago."

188.    On Saturday September 20, 2008, Morgan Stanley had an emergency board meeting.  As defendant Mack stated in the Wharton School speech, when the meeting was held he was not sure if Morgan Stanley could survive.  The situation looked, as Mack later described it, "dire."  CFO Kelleher gave a negative presentation on the firm's finances.  One director, Charles Noski asked him, *"When do we run out of money?"*  Kelleher's answer was that

*"depending on what happens Monday and Tuesday, it could be as early as middle of the week." Too Big to Fail*, at 463 (emphasis supplied).

189.   After Morgan Stanley's first board meeting of that day, defendant Mack received a call from Secretary Paulson, who said "We cannot have Monday morning open without a solution to your firm. You have to find a partner." Secretary Paulson expressed strong disbelief that the deal with Mitsubishi UFJ would go through.   Mack stated in his Wharton speech that this was an emotional low point for him.

190.   That night, as he later told Bloomberg News, defendant Mack shared with his wife that there was a chance he could lose the firm. *Too Big To Fail*, at 469.

191.   Under pressure from the government, on Sunday, September 21, 2008, Morgan Stanley met with JPMorgan. JPMorgan had been strongly encouraged by the government to acquire Morgan Stanley, but did not want to do so. Morgan Stanley, by that point, was hoping to become a bank holding company under the Federal Reserve, and thus provided JPMorgan only with a look at collateral that it would not be able to pledge to the Federal Reserve.   When JPMorgan saw those assets, it quickly backed out of the negotiations. Also on Sunday, Mack held another board meeting at which Roger Altman, a banker and consultant from Evercore Partners who had been hired to advise the Board, told the Board that they must seriously consider selling Morgan Stanley in its entirety. *Too Big To Fail*, at 479.

192.   Later that day, Secretary Paulson, Chairman Bernanke and Mr. Geithner called defendant Mack again and insisted that he needed to find another partner, and that they did not believe that the Mitsubishi Bank investment would be done in time to save Morgan Stanley. Mr. Geithner told Mack to call JP Morgan CEO Jamie Dimon, who might be interested in buying

Morgan Stanley. Mack responded that Dimon had offered to buy the firm for only $1. Mack did not want to discuss the issue further. *Too Big To Fail*, at 480-481.

193.    Ultimately, Morgan Stanley was able to reach a rough nonfinal agreement for $9 billion with Mitsubishi Bank before the weekend ended, and was also granted holding company status. The firm, however, would still need an additional influx of capital. According to the FCIC Report, "[d]espite the weekend announcements... the run on Morgan Stanley continued. 'Over the course of a week, a decreasing number of people [were] willing to do new repos . . . . "They just couldn't lend anymore.'"

194.    Within one week following Lehman's bankruptcy, Morgan Stanley lost $84.8 billion in prime brokerage deposits—more than four times higher than the "catastrophic scenario" described by Morgan Stanley's executives to the Federal Reserve.

195.    During the second week following Lehman's bankruptcy, Morgan Stanley lost another $43.3 billion in prime brokerage deposits, effectively wiping out nearly all of Morgan Stanley's "free credit" in just two weeks.

196.    Ultimately, Morgan Stanley's two-week loss of $128.1 billion of prime brokerage deposits was six times higher than the "catastrophic scenario" described by Morgan Stanley's executives to the Federal Reserve.

197.    As prime brokerage deposits flew out the door, Morgan Stanley turned to the Federal Reserve for emergency cash to fund its ongoing operations. Through thousands of secret transactions during the third and fourth weeks of September 2008, Morgan Stanley borrowed $107.3 billion in emergency funds from the Federal Reserve to stay in business.

198.    The enormity of Morgan Stanley's borrowing was never publicly disclosed until *Bloomberg News* reported on August 22, 2011, the results of its own detailed study of documents

and other information obtained from the government pursuant to the Freedom of Information Act and under the Dodd-Frank Act.

199.   As reported by *Bloomberg News* on August 22, 2011, Morgan Stanley borrowed the following amounts from the Federal Reserve: (a) $66.3 billion in emergency loans from the PDCF through Morgan Stanley's units in London and the United States; (b) $36 billion from the Term Securities Lending Facility ("TSLF"), another Federal Reserve program to provide emergency cash to broker-dealers in exchange for illiquid mortgage bonds; and (c) $10 billion from the Fed's single-tranche open-market operations, still another emergency lending program for broker-dealers.

200.   As of September 29, 2008, after borrowing $107.1 billion from the Federal Reserve to fund its ongoing operations, Morgan Stanley reported $99.8 billion of liquidity. Thus, without the $107.1 billion in emergency loans from the Federal Reserve, ***Morgan Stanley would have become illiquid*** sometime between September 15, 2008, when it started borrowing money, and September 29, 2008.

201.   No broker-dealer borrowed as much as Morgan Stanley from the Federal Reserve following Lehman's bankruptcy, and the $107.1 billion in emergency loans to Morgan Stanley is most ever in the Fed's nearly 100-year history of emergency lending.

202.   Despite the absence of any disclosure by Morgan Stanley of its liquidity crisis or the enormity of its borrowing in the early part of September 2008, Morgan Stanley unquestionably approached insolvency or collapse as prime brokerage deposits flew out the door. Morgan Stanley's survival was, thus, dependent upon the enormous emergency cash infusions it received from the Federal Reserve.

203.    Although desperately needed, a source of additional funding was not readily apparent.  Whether the government would be passing TARP was by no means certain.  Indeed, Congress initially rejected TARP by a vote of 228 to 205, which was followed by an immediate drop by the Dow Jones Average, of 777.68 points, its largest single day drop ever.  TARP was not passed until October 3, 2008.  In addition, in its initial form, TARP did not include any direct financing to investment banks, and thus provided little comfort to Morgan Stanley.

204.    On Saturday October 8, 2008, Morgan Stanley's Co-President, Walid Chammah was afraid his firm would go out of business.  *Too Big to Fail*, at 511.  Its stock price had continued to drop, last closing at $9.68, which was its lowest level since 1996.  Hedge funds and other clients were once more withdrawing their money.  Dick Bove, an influential analyst at Ladenburg Thalmann, wrote a note to clients comparing Morgan Stanley to Lehman Brothers and Bear Stearns.  Looking back on the time period in his speech to the Wharton School, Mack admitted that Morgan Stanley was "close to really going out of business, call it near death, a death experience."

205.    It was not until October 13, 2008 that the government called the heads of nine banks, including Morgan Stanley, to Washington, D.C., to encourage them to take direct TARP financing, which Secretary Paulson had finally determined to be necessary.  When trying to figure out which banks were likely to resist, Morgan Stanley was one of which Secretary Paulson had no worries about acceptance.  "Mack needed the money, so that should be easy."  *Too Big To Fail*, at 522.  Once Secretary Paulson presented the proposal to them, while certain other banks were still resisting, Mack was the first one to say "[g]ive me the paper" that he could sign to accept the financing.  *Id.* at 526.

206.    In performing its analysis of the events underlying this Complaint, the FCIC concluded that "as massive losses spread throughout the financial system in the fall of 2008, many institutions failed, or would have failed but for government bailouts." FCIC Report at 386. Morgan Stanley -- a primary beneficiary of the bailout whose liquidity had "depended critically" on heavy borrowing from the Fed -- was certainly no exception.

207.    While the public was generally aware that the banking sector was experiencing significant problems, neither the public nor participants in the Plans were aware of the depth of those problems at Morgan Stanley, let alone the serious risk that Morgan Stanley would not survive.   Indeed, throughout the Class Period, Morgan Stanley made numerous public representations seeking to diminish any such concerns, including statements made in connection with Morgan Stanley's earnings for fiscal year 2008.

208.    During the Class Period, while Morgan Stanley hovered at the edge of complete financial collapse, Defendants could have: (1) provided participants of the Plans with specific warnings of the extreme risks facing the Company and therefore choosing Company Stock as a directed investment in the 401(k) Plan; (2) suspended or limited future investments of Company Stock in the 401(k) Plan; (3) liquidated, in whole or part, Company Stock in the 401(k) Plan and ESOP and converted those assets into cash or other safe investment vehicles; or (4) funded Company Contributions in cash.

209.    Instead, Defendants took no action whatsoever, and on information and belief, did not even meet to discuss or consider taking any such actions with respect to Company Stock in the Plans, as Morgan Stanley's stock traded in the $40-50 range in the weeks following the Bear Stearns collapse, then under $20 in the weeks following Lehman Brothers' collapse, reaching a low of under $10 on October 10, 2008 and remaining in the $15 range for the rest of 2008.

### Problems Ensue After Morgan Stanley Averts Collapse

210.   Problems arising out of the financial collapse were felt at Morgan Stanley after its receipt of TARP money.

211.   On December 17, 2008, Morgan Stanley reported an enormous $2.3 billion loss on the fourth quarter of 2008, and a net loss, including loss from discontinued operations, of $2.34 per share.  According to an article of the same date in CNNMoney.com, these figures surpassed even the most dire predictions by analysts.  "Consensus estimates were for a loss of $298 million, or 34 cents a share, according to Thomson Reuters."  The article further reported that "Morgan Stanley's asset management division, typically a consistent performer for the firm, was hit hard during the quarter by losses related to real estate and private equity.  In addition, Morgan Stanley said there was a surge in the number of asset management customers cutting ties with the firm."  It quoted Michael Wong, an equity analyst at research firm Morningstar as stating, "'Just the magnitude of the outflows is amazing — in a bad way.'"  Morgan Stanley also announced that day that its total assets were down that year by more than a third.

212.   In May 2009, government stress tests revealed that Morgan Stanley would require an additional $1.8 billion to support its capital position.  David Ellis, "Stress tests: Banks need $75 billion," CNNMoney.com, May 8, 2009.

213.   Since 2008, Morgan Stanley has also been subject to numerous government investigations of its actions with respect to subprime backed securities.  In June 2010, it paid $102 million to end an investigation by the Massachusetts Attorney General into whether Morgan Stanley had improperly lent billions of dollars to a subprime lender, New Century, and also packaged such loans and sold them to large investors, including pension funds.  In that investigation, Massachusetts Attorney General Martha Coakley indicated Morgan Stanley should have seen many red flags but looked the other way and lowered its own standards to keep New

Century as a business partner.  Reuters, *"Morgan Stanley to Settle Case over Subprime Loans,"* *New York Times*, June 24, 2010.  In addition, Morgan Stanley has been subject to an investigation by the Attorney General of the State of New York into whether it, along with other banks, manipulated credit rating agencies with respect to its subprime assets.  Louise Story, *"Prosecutors Ask if 8 Banks Duped Rating Agencies,"* *New York Times*, May 13, 2010.

## VIII.   DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT COMPANY STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLANS

214.   Upon information and belief, each Defendant, in the performance of his or her fiduciary duties, knew or should have known that: (1) Morgan Stanley faced imminent collapse because of its subprime risk (including proprietary trading as well as counterparty risk) and because its access to funds needed for continued operations was impaired and declining; (2) it failed to disclose material adverse information concerning the risks associated with Morgan Stanley's stock, as alleged herein; and (3) that Company Stock was therefore an imprudent investment for the Plans.

215.   Through their high ranking positions within Morgan Stanley -- especially defendant Mack -- Defendants knew or should have known of the existence of the above-described problems.

216.   As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of Morgan Stanley, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Company Stock did not effectively inform the Plans' participants of the past, immediate and future dangers of investing in Company Stock.

217.   In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their

fiduciary duties under the Plans and ERISA.  Upon information and belief, Defendants also failed to conduct an appropriate investigation -- or any investigation at all -- into whether Company Stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Morgan Stanley's deep-rooted problems so that participants could make informed decisions regarding whether to invest in Company Stock in the Plans.

218.    In addition, upon information and belief, Defendants conducted reviews and investigations into whether other investment options for the Plans – but not Company Stock – were prudent investments for the Plans.  Defendants should have at a minimum – but did not – undertake similar reviews or investigations of the prudence of investing the Plans in Company Stock.

219.    An adequate (or even cursory) investigation would have revealed that investment by the Plans in Company Stock, under these circumstances, was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.  Defendants failed to make such investigation and thereby failed to protect the Plans' participants against the resulted unnecessary losses.

220.    Because Defendants knew or should have known that Company Stock was not a prudent investment option for the Plans, they had a duty to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Company Stock.

221.    Defendants had available to them several different options for satisfying this duty, including, but not limited to: (i) making appropriate public disclosures as necessary;

67

(ii) divesting the Plans of Company Stock; (iii) discontinuing further investments in Company Stock by the participants in the Plans; (iv) making all Company Contributions in the form of cash rather than Company Stock, as Defendants had the unfettered discretion to do; (v) eliminating all restrictions on the transfer of Company Stock into alternative investments; (vi) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; (vii) notifying appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company Stock an unsuitable and imprudent investment for the Plans; and/or (viii) resigning as fiduciaries of the Plans to the extent that as a result of their employment by Morgan Stanley they could not loyally serve the Plans and its participants in connection with the Plans' acquisition and holding of Company Stock.

222.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses resulting from the Plans' investment in Company Stock. In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company Stock, including all Company Contributions, even after Morgan Stanley's problems came to light.

IX.    **CERTAIN DEFENDANTS WERE MOTIVATED BY PERSONAL INTERESTS WHICH WERE NOT CONSISTENT WITH THEIR FIDUCIARY DUTIES**

223.    As of November 30, 2008, defendant Mack beneficially owned over 4 million shares of Morgan Stanley common stock, defendant Chammah beneficially owned over 1.4 million shares and defendant Gorman beneficially owned over 1 million shares, while directors and executive officers of Morgan Stanley as a group owned 8,758,214 shares. In addition, on information and belief, the compensation of Mack and other Defendants was tied to the performance of Company Stock during all or part of the Class Period.

224.   Therefore, some of the Defendants were incentivized to keep the Plans' assets heavily invested in Company Stock on a regular, ongoing basis because elimination of Company Stock as an investment option for the Plans and/or divestment of Company Stock from the Plans would have sent a negative signal to the investment community and driven down the price of Company Stock, thereby reducing the value of Defendants' holdings and/or compensation.

225.   Some Defendants may have had no choice in tying their compensation to Company Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plans' participants' and beneficiaries' retirement savings tied up to a large extent in Company Stock or whether properly to inform participants of material negative information concerning the above-outlined problems at Morgan Stanley.

X.   **CAUSATION**

226.   The Plans suffered massive losses because a substantial amount of their assets were imprudently invested by the Plans in Company Stock during the Class Period, in breach of Defendants' fiduciary duties.

227.   Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning Company Stock and divesting the Plans from Company Stock offered by the Plans when such investments became imprudent, the Plans would have avoided losses suffered as a result of imprudent investment in the Fund, as opposed to the returns they would have achieved with alternative prudent investments offered in the Plans.

228.   As a result of Defendants' actions and inactions alleged above, Plaintiffs and the Class, which invested in Company Stock through the Plans, were damaged, as the Plans suffered substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein.  Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they

would have taken steps to eliminate or reduce the amount of Company Stock held by the Plans, eliminated the option for participants to invest funds in Company Stock, or fully disclosed the material adverse facts concerning Company Stock described herein.  Plaintiffs and the Class are entitled to the best alternative investment available to them under the circumstances, and the Plans would have achieved gains and avoided losses but for Defendants' breaches of fiduciary duty as described herein.

229.    Furthermore, under ERISA, fiduciaries -- not participants -- exercise control over the selection of investment options made available to participants.  Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plans suffered losses.  Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans and are not entitled to any protection under ERISA § 404(c).

230.    The losses suffered by the Plans and Plans' participants and beneficiaries, including Plaintiffs and the Class, were the direct and necessary result of the alleged misconduct of Defendants herein.  Plaintiffs and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of Defendants' continuing breaches of fiduciary duty in failing to disclose material facts.

XI.    **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(Against All Defendants)**

**Failure to Prudently and Loyally Manage the Plans' Assets**

**(Breaches of Fiduciary Duties in Violation of**
**Section 404 of ERISA, 29 U.S.C. § 1104)**

231.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

232.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and/or ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

233.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.   Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that investment in Company Stock in the Plans was prudent and that such investments were consistent with the Plans' purposes.   Defendants are liable for losses incurred as a result of such investments being imprudent.

234.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

71

235.   Defendants breached their duties to prudently and loyally manage the Plans' assets.  During the Class Period, as alleged herein, Defendants knew or should have known that Company Stock was not a suitable and appropriate investment for the Plans and clearly did not serve the Plans' purpose of helping participants save for retirement.  Despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect participants of the Plans from the inevitable losses they knew would ensue by eliminating or curtailing any further investment in Company Stock, divesting some or all of the Company Stock in the Plans, or providing additional disclosures to participants of the Plans so that they could act accordingly.   Upon information and belief, Defendants undertook no action during the Class Period to protect the Plans and their participants from the catastrophic losses they suffered.

236.   Although Defendants knew or should have known of the significant problems facing the Company, including the possibility of its bankruptcy in breach of their fiduciary duties, they (a) failed to conduct an appropriate investigation into whether Company Stock was a prudent investment for the Plans, including consulting or appointing independent fiduciaries regarding the appropriateness of an investment in Company Stock;  (b) failed to limit or discontinue further Plan contributions to Company Stock; (c) failed to fully or partially divest the Plans of Company Stock; (d) failed to fund Company Contributions during the Class Period in cash rather than Company Stock; and (e) failed to resign as fiduciaries of the Plans if, as a result of their employment by Morgan Stanley or its affiliates, they could not loyally serve the Plans and their participants.

237.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

238.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans lost a significant amount of their value.

239.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**SECOND CAUSE OF ACTION**
**(Against All Defendants)**

**Failure to Provide Complete and Accurate Information**

**(Breaches of Fiduciary Duties in Violation of**
**Section 404 of ERISA, 29 U.S.C. § 1104)**

240.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

241.   At all relevant times, the scope of the fiduciary responsibility of all Defendants included Plan-related communications and material disclosures.

242.   The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information participants need to exercise their rights and interests.  This duty to inform participants includes an obligation to provide plan participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding investment options such that participants can make informed decisions with regard to the prudence of investing in such options as are made available.  This duty applies to all plan investment options, including investment in the stock of the participant's employer.

243.   During the Class Period, Defendants made direct and indirect communications with the Plans' participants, including statements regarding investments in Company Stock.

These communications included, but were not limited to, SEC filings, annual reports, press releases and Plan documents (including SPDs and/or prospectuses regarding the Plans' holdings of Company Stock), which included and/or reiterated these statements.  At all times during the Class Period, Morgan Stanley's SEC filings were incorporated into and part of the SPDs and/or the Form S-8 registration statements.

244.   Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

    (a)    employees tend to interpret a match in company stock as an endorsement of the company and its stock;

    (b)    out of loyalty, employees tend to invest in company stock;

    (c)    employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

    (d)    employees tend not to change their investment option allocations in the plan once made;

    (e)    no qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

    (f)    lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

    (g)    even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

245.   While Defendants knew or should have known these facts and knew of the high concentration of the Plans' funds in Company Stock, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding the Morgan Stanley's financial and operational health and future prospects and/or did nothing to correct such statements.

246.   Defendants knew that investment in Company Stock carried with it an inherently high degree of risk.   This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

247.   Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Morgan Stanley's exposure to the subprime market, and the consequent risk and inflation of the value of the Company Stock and, generally, by conveying inaccurate information regarding Morgan Stanley's future outlook.   These failures were particularly devastating to the Plans and their participants – losses in this investment had an enormous impact on the value of participants' retirement assets.

248.   These actions and failures to act were uniform and caused the Plans, and/or the participants and beneficiaries of the Plans, to continue to make and maintain substantial investments in Company Stock in the Plans at a time when Defendants knew or should have known that the Plans' participants and beneficiaries lacked complete and accurate information concerning their investments.   Plaintiffs and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company Stock.

249.   Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of a plan resulting in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment.   Here, the above-described statements, acts and omissions of the Defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company Stock and were material to any reasonable person's decision about whether or not to invest or maintain any

part of his or her invested assets of the Plans in Company Stock during the Class Period. Plaintiffs and other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts and omissions of the Defendants as described herein.

250.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to manage prudently and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

251.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**THIRD CAUSE OF ACTION**
**(Against All Defendants)**

**Breach of Duty to Avoid Conflicts of Interest**

**(Breaches of Fiduciary Duties in Violation of**
**Section 404 of ERISA, 29 U.S.C. § 1104)**

252.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

253.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

254.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing to timely engage independent fiduciaries who could make

independent judgments concerning the Plans' investments in Company Stock; and otherwise placing their own interests above the interests of the participants with respect to the Plans' investment in the Company Stock.

255.   In addition, certain of the Defendants had significant personal investments in the stock of Morgan Stanley through, *inter alia*, receipt of such stock pursuant to incentive and stock options and restricted share awards.   Those Defendants had a significant personal financial incentive to maintain a high price for Company Stock.   Defendants had an incentive not to disclose negative financial results to the Plans' participants in hopes that such participants would select Company Stock for their retirement accounts and therefore help maintain a high price for Company Stock.

256.   Defendants also had an incentive to maintain Company Stock as an investment in the Plans because the elimination of Company Stock as an investment in the Plans would have sent a negative signal to Wall Street analysts, which in turn would have resulted in reduced demand for Company Stock and a drop in the stock price.   Since the compensation of certain Defendants depended on the market price of the common stock of Morgan Stanley, this sequence of events would reduce their compensation.

257.   As such, Defendants breached their fiduciary duty of loyalty because they were faced with a conflict of interest, which they did not promptly resolve, between their own interest and the interests of the Plans' participants.   Defendants' interest in maintaining an artificially high price for Company Stock was in direct conflict with the participants' interests in: (i) voiding investing their retirement accounts in Company Stock when it was imprudent to do so and (ii) receiving accurate information concerning Morgan Stanley upon which to base their investment decisions.

258.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered hundreds of millions of dollars in losses.  If Defendants had discharged their fiduciary duties prudently to manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans lost a significant amount of their value.

259.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**FOURTH CAUSE OF ACTION**
**(Against Morgan Stanley, MS&Co, the Morgan Stanley**
**Director Defendant and the MS&Co Director Defendants)**

**Failure to Adequately Monitor Other Fiduciaries and**
**Provide them with Accurate Information**

**(Breaches of Fiduciary Duties in Violation of Section 404 of ERISA, 29 U.S.C. § 1104)**

260.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

261.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of the MS&Co Director Defendants included the responsibility to appoint, evaluate and monitor the members of the Investment Committee.

262.    In addition, the other Defendants named in this Count had a fiduciary duty to give information to and review the actions of these fiduciaries.  In this case, that means that the monitoring fiduciaries had the duty to:

> (a)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

78

(b)     Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(d)     Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(f)     Ensure that the monitored fiduciaries report regularly to Morgan Stanley MS&Co, the directors of Morgan Stanley or the directors of MS&Co. Morgan Stanley and MS&Co must then review, understand, and approve the conduct of the hands-on fiduciaries.

263.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

264.    The Defendants named in this Count breached their fiduciary monitoring duties by, among other things, failing to ensure that the monitored fiduciaries: (a) had access to knowledge about Morgan Stanley's business problems alleged above, which made Company Stock an imprudent retirement investment, and (b) completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company Stock, an investment that was imprudent and subject to inevitable and significant depreciation.

265.    The Defendants named in this Count, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information

79

about the financial condition of Morgan Stanley, which they knew or should have known as alleged herein, in order to allow the fiduciaries to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, the Defendants named in this Count breached their monitoring duties under the Plans and ERISA.

266.    The Defendants named in this Count knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plans to continue offering the Company Stock as an investment alternative for the Plans, and (ii) continuing to invest the assets of the Plans in Company Stock when it was no longer prudent to do so.  Despite this knowledge, the Defendants named in this Count failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

267.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans lost a significant amount of their value.

268.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties.

### FIFTH CAUSE OF ACTION
#### (Against All Defendants)

#### Co-Fiduciary Liability

#### (Breaches of Fiduciary Duties in Violation of Section 404 of ERISA, 29 U.S.C. § 1104)

269.    Plaintiffs incorporate the foregoing paragraphs herein by reference

270.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he or she participates

knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) he or she fails to comply with § 1104(a)(l) in the administration of his or her specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he or she has knowledge of a breach by such other fiduciary, unless he or she makes reasonable efforts under the circumstances to remedy the breach.

**Concealing a Breach**

271.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes co-fiduciary liability on a fiduciary for a fiduciary breach of another fiduciary if he or she participates knowingly in, or knowingly undertake to conceal, an act or omission by such other fiduciary, knowing such action or omission is a breach.

272.    As alleged herein, Morgan Stanley, through its officers and employees, withheld material information from and provided misleading disclosures to the Plans' participants.  In addition, as alleged herein, the other Defendants participated in and/or knew about the Morgan Stanley's misrepresentations and omissions regarding the Morgan Stanley's financial condition, and thus had knowledge at all relevant times of the factual matters pertaining to the imprudence of Company Stock as an investment for the participants' retirement assets.

273.    Despite   this   knowledge,   Defendants   knowingly   participated   in   their co-fiduciaries' failures prudently and loyally to manage the Plans' investment and holding of Company Stock during the Class Period.  They did so by themselves making imprudent and disloyal decisions respecting the Plans' investment in Company Stock in the manner alleged herein.

**Enabling a Breach**

274.     ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes co-fiduciary liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the administration of his or her specific responsibilities that give rise to his or her status as a fiduciary, he or she has enabled another fiduciary to commit a breach.

275.     To the extent it is determined that any of the Investment Committee Defendants lacked knowledge of the circumstances rendering the Plans' investment in Company Stock imprudent, then all other Defendants enabled the imprudent decisions of those Defendants by failing to provide those Defendants with complete and accurate information, including the information alleged herein regarding Morgan Stanley's exposure to the subprime credit market. In failing to inform their co-fiduciaries, who lacked knowledge, these Defendants breached ERISA § 405(a)(2).

276.     In addition, through their failure properly and effectively to monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint, Defendants enabled the Investment Committee Defendants' imprudent management of Company Stock in the Plans.

**Failure to Remedy**

277.     ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he or she has knowledge of a breach by such other fiduciary, unless he or she makes reasonable efforts under the circumstances to remedy the breach.

278.     Defendants failed to undertake any effort to remedy their co-fiduciaries' failures prudently and loyally to manage the Plans' investment in Company Stock, as well as other fiduciary breaches.  Instead, they allowed the harm to continue and contributed to it throughout

the Class Period in violation of ERISA § 405(a)(3).  The actions that could have been taken, included but are not limited to: (i) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Boards of Directors; (ii) disclosing the imprudence of the investment in Company Stock to the Plans' participants; (iii) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (iv) preparing to obtain an injunction from a Federal District Court.

279.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plans caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

## XII.    SECTION 404(c) DEFENSE INAPPLICABLE

280.    The Plans suffered losses, and the Plaintiffs and the other Class members suffered losses, because substantial assets in the Plans were invested in Company Stock during the Class Period in violation of the Defendants' fiduciary duties.

281.    As to contributions invested in Company Stock, Defendants were responsible for the prudence of investments provided under the Plans during the Class Period, unless the Plans satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

282.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plans.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.  In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of

83

liability for any losses which are the direct and necessary result of investment instructions given by such participants or Beneficiary." 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i)

283.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding Company Stock in the Plans.  Accordingly, participants failed to exercise the requisite independent control over their investment in Company Stock in the Plans.

284.    In addition, § 404(c) does not apply to any portion of the Plans: (i) derived from Company Contributions as those investments were made at the sole discretion of Morgan Stanley; or (ii) deemed an ESOP in that the Secretary of Labor has interpreted the provision to apply only to plans that provide plan participants with a full range of investment options, which an ESOP by its very nature does not.  See 29 C.F.R. § 2550.404c-1 (1996).

285.    Defendants' liability to the Plans, Plaintiffs and the Class for relief stemming from the Plans' imprudent investments in Company Stock, is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts or omissions of Defendants.

## XIII.   REMEDY FOR BREACHES OF FIDUCIARY DUTY

286.    As noted above, as a consequence of the Defendants' breaches, the Plans suffered significant losses.

287.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

288.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan assets to what they would have been if the plan had been properly administered.

289.   Plaintiffs, the Plans and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs; and (v) interests on these amounts, as provided by law; and (vi) such other legal or equitable relief as may be just and proper.

290.   Each Defendant is jointly liable for the acts of each other Defendant as a co-fiduciary.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

A.      A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and their participants;

B.     A Declaration that Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.     An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.     An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Morgan Stanley maintained by the Plans in proportion to the accounts' losses attributable to the decline in the stock price of Morgan Stanley;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated:  September 27, 2011

MILBERG LLP

_Sanford P. Dumain_

Sanford P. Dumain
Lori G. Feldman
Arvind Khurana
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
Email: sdumain@milberg.com
        lfeldman@milberg.com
        akhurana@milberg.com

Mark C. Rifkin
Michael Jaffe
WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
Email: rifkin@whafh.com
        jaffe@whafh.com

Robert I. Harwood
James G. Flynn
Tanya Korkhov
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630
Email: rharwood@hfesq.com
        jflynn@hfesq.com
        tkorkhov@hfesq.com

*Counsel for Plaintiffs*

87

Thomas J. McKenna
GAINEY & MCKENNA
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone:  (212) 983-1300
Facsimile:  (212) 983-0383
Email:  tjmckenna@gaineyandmckenna.com

Jeffrey Abraham
ABRAHAM FRUCHTER & TWERSKY LLP
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone:  (212) 279-5050
Facsimile:  (212) 279-3655
Email: jabraham@aftlaw.com

Milo Silberstein
DEALY & SILBERSTEIN, LLP
225 Broadway, Suite 1405
New York, NY 10007
Telephone:  (212) 835-0066
Facsimile:  (212) 385-2117
Email:  msilberstein@dealysilberstein.com

***Additional Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I, Scott R. Foglietta, hereby certify that on Tuesday, September 27, 2011, I caused the

foregoing CORRECTED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF

THE EMPLOYEE RETIREMENT INCOME SECURITY ACT to be served upon the following

by United States mail:

Robert F. Wise, Jr., Esq.
Charles S. Duggan, Esq.
DAVIS POLK & WARDELL
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 540-4000
Facsimile: (212 540-3800